M.C. JEFFERS, Al Porter, Evangeline Brown, Clyde Collins, O.C. Duffy, Earl Foster, the Rev. Ellihue Gaylord, Shirley M. Harvell, Linda Shelby, J.C. Jeffries, Lavester McDonald, Joseph Perry, Clinton Richardson, T.E. Patterson, Earnest Simpson, Brian Smith, and Charlie Statewright, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,

v.

Bill CLINTON, in His Official Capacity as Governor of Arkansas and Chairman of the Arkansas Board of Apportionment; W.J. McCuen, in His Official Capacity as Secretary of State of Arkansas and Member of the Arkansas Board of Apportionment; and Steve Clark, in His Official Capacity as Attorney General of Arkansas and Member of the Arkansas Board of Apportionment, Defendants.

No. H–C–89–004.

United States District Court, E.D. Arkansas, E.D.

Submitted Nov. 3, 1989.

Decided May 16, 1990.

Judgment May 16, 1990.

P.A. Hollingsworth, Little Rock, Ark., L.T. Simes, II, West Helena, Ark., Kathleen Bell, Helena, Ark., Olly Neal, Jr., Marianna, Ark., Don E. Glover, Dermott, Ark., Penda D. Hair, Washington, D.C., Donna L. Dennis, Julius L. Chambers, Dayna L. Cunningham, Sherrilyn Ifill, New York City, Sheila Y. Thomas, NAACP Legal Defense Inc., Washington, D.C., for plaintiffs.

Frank J. Wills, III, Atty. General's Office, Little Rock, Ark., for defendants.

Before ARNOLD, Circuit Judge, EISELE, Chief District Judge, and HOWARD, District Judge.

ARNOLD, Circuit Judge.

On December 4, 1989, we filed our first opinion in this voting-rights case. We held that the plan of apportionment then in effect for the Arkansas General Assembly—the plan adopted by the State Board of Apportionment in 1981—diluted the votes of black citizens in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. §§ 1973 *et seq.* We directed the defendants to submit a new, lawful plan in time for use in the 1990 elections. The questions whether the defendants had also violated the Constitution, and whether, if so, the remedy of preclearance under Section 3(c) of the Voting Rights Act, 42 U.S.C. § 1973a(c), should be applied, were left to be decided in another opinion. This is that opinion.

We hold that the State of Arkansas has committed a number of constitutional violations of the voting rights of black citizens. Some violations are distant in time, and their effects are in large part no longer with us. Others have already been remedied by judicial action. Still others are not of the type curable by preclearance. But a limited preclearance remedy is still required by this record. The State has systematically and deliberately enacted new majority-vote requirements for municipal offices, in an effort to frustrate black political success in elections traditionally requiring only a plurality to win. We therefore direct that any future laws, standards, or practices designed to enforce or enhance a majority-vote requirement not take effect until the preclearance process has run its course. We further direct that the plan of apportionment for the State Legislature to be adopted by the Board of Apportionment after the 1990 census not take effect until the plaintiffs have had a chance to inspect it and to challenge it in this Court.

I.

We begin by setting out Section 3(c) of the Voting Rights Act, the statute that

principally governs this part of the case. It reads as follows:

(c) If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in section 1973b(f)(2) of this title: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the court's finding nor the Attorney General's failure to object shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

Obviously this case is one in which this statute at least potentially applies. It is a proceeding instituted by aggrieved persons under a statute (the Voting Rights Act), and the purpose of both the statute and the proceeding is to enforce the voting guarantees of the Equal Protection Clause of the Fourteenth Amendment and of Section 1 of the Fifteenth Amendment. Other provi-

sions of the Voting Rights Act automatically apply the preclearance remedy (the requirement of advance federal approval of changes in election laws and practices) to certain states and political subdivisions. Section 3(c) empowers a court, in a proper case, to impose this remedy on States or political subdivisions not originally covered. Arkansas did not have a literacy test for voting in 1965, when the Voting Rights Act originally became law, and so it was not among those jurisdictions subject to preclearance by the statute. Plaintiffs ask us to subject the State to preclearance in this case. In order to decide this claim, we must determine (1) whether violations of the Fourteenth or Fifteenth Amendments justifying equitable relief have occurred within the State or any of its political subdivisions; and (2) whether, if so, the remedy of preclearance should be imposed. To those issues we now turn.

## II.

### A.

Before discussing the proof, we must decide what legal standard applies to the question whether constitutional violations have occurred. All parties agree that intentional racial discrimination is an essential element of plaintiffs' claim under the Equal Protection Clause of the Fourteenth Amendment. They disagree, however, with respect to the Fifteenth Amendment. Plaintiffs take the position that a discriminatory impact on black voters is sufficient to establish a Fifteenth Amendment claim. This is essentially the same legal standard as the "results test" enacted as a matter of statute by the 1982 amendments to the Voting Rights Act. Defendants, on the other hand, argue that intentional racial discrimination must be shown.

We think defendants have the better of the argument on this point. We look first to the text of Section 1 of the Fifteenth Amendment. It reads:

The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on

account of race, color, or previous condition of servitude.

For purposes of comparison, we also set out here the text of the Equal Protection Clause of the Fourteenth Amendment:

No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

If the language of the Fifteenth Amendment cuts either way on this issue, it points towards requiring proof of racial animus. The Fourteenth Amendment, which concededly requires such proof, speaks only in terms of action and result. It might have been (though it has not been) rather easily construed to forbid discriminatory impact, without regard to the intention of the defendants. But the Fifteenth Amendment speaks not merely in terms of action and result (denial or abridgement of the right to vote), but specifies as well that the prohibited denial or abridgement must be "on account of" race. The phrase "on account of," we think, is naturally read as referring to the reason for the action taken, the intention behind it. We do not pretend, however, that this textual argument is conclusive: "on account of" could also refer strictly to causation. In this sense, if a racial minority is disproportionately affected by, say, a poll tax, one might say that the poll tax abridges the right to vote on account of, that is, as a result of, race.

So, as usually happens, the words of the Constitution do not themselves conclusively answer the question. Nor do the parties cite any evidence of context, of the intention of the Framers, on this point. We look, therefore, to constitutional tradition, to precedent, and here we find a rather clear answer. It seems to have been generally accepted, up until about ten years ago, anyway, that invidious motivation is an essential element of a Fifteenth Amendment claim. An early case, *Guinn v. United States*, 238 U.S. 347, 363–65, 35 S.Ct. 926, 930–31, 59 L.Ed. 1340 (1915) (invalidating the "grandfather clause"), clearly says so. One of the last major Supreme Court opinions on voting rights before the enactment of the Voting Rights Act is, in our opinion, to the same effect. In *Lassiter v. Northampton Board of Elections*, 360

U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), a unanimous opinion written by Justice Douglas, the Court upheld North Carolina's literacy test for voting. In doing so, it used language indicating that deliberate racial discrimination was an essential element of proof for those attacking the literacy-test statute: the law evidenced a legitimate concern for an informed electorate, and was "not a calculated scheme to lay springes for the citizen." *Id.* at 54, 79 S.Ct. at 991. This language comes at the end of the Court's opinion, in a sort of peroration, and seems clearly intended to summarize the essential reason for its holding. And if discriminatory impact alone had been sufficient to show a constitutional violation, it is hard to see how the literacy test could have survived.

In *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), however, the question was squarely presented, and neither side mustered a clear majority of the Court. A plurality of four Justices, speaking through Justice Stewart's lead opinion, firmly advocated the intent standard. *Id.* at 61–65, 100 S.Ct. at 1496–1499. Justices Marshall and Brennan, in dissent, argued for its rejection. *Id.* at 129–35, 100 S.Ct. at 1533–36. Justice Stevens took an intermediate position. *Id.* at 90, 100 S.Ct. at 1511. Justices White and Blackmun, writing separately, seemed to assume that intent was a requirement, but did not say so unequivocally. *Id.* at 94–103, 80, 100 S.Ct. at 1513–1518, 1506.

In the face of this uncertain guidance, what is a lower court to do? We read the signs as pointing rather firmly towards a requirement that intent be proved. Mere numbers, short of a majority, are not conclusive, but it is of some relevance that more Members of the Court thought intent was required in *City of Mobile*, than took the opposite position. More importantly, we find the reasoning of the plurality opinion persuasive. And pre-*Mobile* authority, as we read it, is strongly in accord. This reading of the Constitution has the virtue of distinguishing between constitutional claims, which require a showing of intent, and statutory claims, which, after the 1982

amendments, do not. Under Section 2 of the Fifteenth Amendment, Congress has the power, which it has exercised in the Voting Rights Act, to prohibit practices which would not have been proscribed by Section 1 of the Amendment *ex proprio vigore.*

■ We hold that the same proof of conscious racial discrimination required to show a violation of the Equal Protection Clause of the Fourteenth Amendment is also required in Fifteenth Amendment cases. *Accord, Nevett v. Sides,* 571 F.2d 209, 220–21 (5th Cir.1978). This does not mean that racial discrimination must be the sole motive behind the action challenged. It need only be one of the motivating factors but for which the action would not have been taken. In addition, there will rarely be direct proof of the forbidden motive. Courts must be sensitive to circumstantial evidence from which a reasonable inference of discriminatory intent may be drawn. That a given action has a disparate impact, and that State officials knew that it would, can in a proper case, depending on the other proof in the record, be an important part of such circumstantial evidence— especially if there is no reasonable nondiscriminatory justification for what has been done. Finally, we should not allow a natural reluctance to attribute illicit motives to high State officials to deter us from our duty. The burden of proof is not artificially high. It is only the ordinary civil burden of a preponderance of the evidence.

### B.

■ Plaintiffs' first claim of intentionally discriminatory action is the 1981 plan of apportionment itself. The evidence supporting plaintiffs' position is substantial. The Board of Apportionment had adopted a set of guidelines that included an admonition against dilution of minority votes. The Board was thoroughly familiar with the political and demographic situation obtaining in the various parts of the State, and it had available to it census figures on the racial breakdown of each township or smaller census unit. Although questions of minority representation were brought before the Board repeatedly, it took no affirmative action to ensure that any districts with a majority-black voting-age population were created, apart from one Senate district, one three-member House district in Pulaski County, and one House district in Jefferson County. Yet, the Board must have known that a significant number of additional majority-black districts could have been created. Although voting-age numbers were not before the Board as such, they could easily have been developed. Further, the Board must have known that a majority-black district could have been created in Crittenden County, but it chose, instead, to create a two-member district in which the population would not be majority black. And district 100, including almost all of Chicot County, part of Ashley County, and two townships in Desha County, could easily have been made majority black. Wilmot Township in Ashley County could have been substituted for the two Desha County townships, and this would have done the trick.

These and similar concerns were definitely brought to the attention of the Board. At the Board's public hearings, both black and white citizens strongly advocated single-member districts. At the public hearing in Pine Bluff, Mr. Elijah Coleman, a leading black citizen, urged that single-member majority-black districts be created, over and above the one such district already in existence. A coalition led by Ms. Brownie Ledbetter, called the Arkansas Committee for Fair Representation, took a similar position. This coalition, which included various citizens' groups like the NAACP, the National Organization of Women, the Arkansas Education Association, the AFL–CIO, and the Urban League, asked for a postponement in the final adoption of the plan, in order to allow it to gather information to address the problem of minority representation. This request was denied. The same group, with the support of Governor White, appeared at the final meeting of the Board of Apportionment and asked to speak. This request was also denied. The Board went ahead and adopted its plan, over the dissent of

Governor White, who voiced many of the same concerns, among others.

There is, however, strong evidence on the other side of the question as well. The factor uppermost in the Board's mind was that the districts created had to be substantially equal in population. Data on the racial makeup of each area were available, but they were not in the form of voting-age statistics, nor is it apparent that anyone provided the Board with information in this form. In addition to population equality, the Board was also concerned with natural boundaries, political boundaries, and stability of representation. It took the 1971 apportionment map as a starting point, considered the residence of incumbent legislators, especially those who were politically powerful and had seniority, and tried to come up with a plan that would disturb the existing allocation of political power as little as possible, all while complying with the over-arching requirement of one person, one vote. The Board did not specifically calculate the minority population of each of its proposed districts before adopting them, as it could well have done, but the law in effect at the time, represented most recently by the *City of Mobile* decision, did not, in the Board's view, require it to make such calculations. When the Board refused an extension of time and adopted its final plan at the end of June 1981, it felt itself under some time pressure: the time deadline set by the State Constitution, Article VIII, § 4 (February 1, 1981), had long since passed. Political pressure was building daily, and the Board thought it desirable to bring the matter to a swift conclusion. It refused to give floor time to the Arkansas Committee for Fair Representation, even though the rule against allowing individual citizens to address the Board was not uniformly followed, but members of the Board had already been approached individually by members of the Committee, and it can fairly be assumed that the Board was familiar with the Committee's position.

The rejection of Governor White's views by the two Democratic members of the Board, Attorney General Steve Clark and Secretary of State Paul Riviere, was due in large part to the natural political antago-nism between the parties. Frank White was only the second Republican to take part in the deliberations of the Board of Apportionment since the adoption of the Constitution of 1874. It is perhaps unfortunate, but it is nevertheless true, that one political party will often automatically oppose what another one proposes, and we think this factor accounted for much of what happened here. The two Democrats on the Board thought that Governor White was primarily motivated by a desire to improve Republican chances of electing members of the Legislature, and this is something they wanted to avoid.

The stickiest aspect of the case from the defendants' point of view is the decision to create a multi-member district in Crittenden County. The Board had decided, in general, that multi-member districts were not desirable. Creation of two single-member districts in Crittenden County would have required that the City of West Memphis be split, but other cities, including Little Rock, Pine Bluff, and El Dorado, were split. (On the other hand, multi-member districts were used to avoid splitting Fayetteville, Hot Springs, and Jonesboro.) Plaintiffs offer Union County, in which El Dorado is located, as a particular contrast to Crittenden County. Why, they say, were two single-member districts created in Union County, but not in Crittenden County? General Clark's explanation for this seeming disparity is that there was a strong community of interest throughout Crittenden County, and that Union County is the largest county in the State in geographic area. It is true, in addition, that Crittenden County had traditionally been given multi-member representation. Under the 1971 plan, Crittenden County made up a three-member district.

We have pondered this question of fact in the context of the entire record, including the live testimony of Attorney General Clark and Governor White, the deposition of Secretary of State Paul Riviere, and the proof as to the Senate Report or *Zimmer* factors detailed in our first opinion in this case. We are not persuaded that plaintiffs' proof is any stronger than defendants' on

the point. Whether there is a greater community of interest in Crittenden County as a whole than in Union County as a whole is certainly debatable, but Attorney General Clark, who comes from Eastern Arkansas, could well have thought so. Eastern Arkansas probably is more homogeneous economically and culturally than South Arkansas. Both Governor White and Attorney General Clark explicitly denied any intention to discriminate on the basis of race. These denials cannot, of course, be given controlling weight. But neither can they be ignored. We are not persuaded that the Board was motivated by an affirmative intention to harm black voting rights. Its attitude, instead, can best be described as indifference. It took no action to enhance minority voting rights, but neither did it move in any positive way to dilute them. The result, as explained in our first opinion, was in fact to dilute them, but result is not the same as intention. We find that plaintiffs have not carried their burden on this issue.

Plaintiffs argue, in addition, that deliberate indifference to black voting rights, in the form of a knowing failure to correct dilution, is the legal equivalent of intentional discrimination. In support of this position they cite *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), a voting case under the Equal Protection Clause of the Fourteenth Amendment. We do not so read the case. *Rogers* is written from the point of view of an appellate court reviewing a finding of fact that intentional discrimination has occurred. The Supreme Court, in the course of an opinion holding that this finding was not clearly erroneous, referred to evidence that defendants knowingly maintained an electoral plan that failed to redress acknowledged vote dilution. We do not read *Rogers* as creating a new legal standard. Rather, it simply describes one kind of evidence that can support an ultimate finding of intentional discrimination. Here, of course, we function as a trial court, as the triers of fact. It is our task to consider all the evidence, including evidence of a deliberate failure to correct vote dilution, and decide whether intentional discrimination has been proved.

For reasons we have attempted to explain, we do not believe that it has been. We therefore hold that the 1981 plan of apportionment did not violate either the Fourteenth or the Fifteenth Amendments.

### C.

In defendants' view, this should be the end of the case. The complaint was brought to challenge, under the Voting Rights Act and the Constitution, the 1981 plan of apportionment. If that plan was not unconstitutionally adopted, there are no violations of the Constitution justifying equitable relief, and preclearance would not be appropriate under Section 3(c) of the Act. Other alleged constitutional violations with respect to election laws and practices are beside the point, because, the argument runs, they were not pleaded in the complaint. We reject this view of the law. At least since the time of the pretrial conference, which was held in open court, and at which all sides freely discussed all of the legal and factual issues, it has been clear that plaintiffs would attempt to prove a pattern of statutory and constitutional violations of their voting rights. All of the issues were on the table before trial, defendants had a full and adequate opportunity to offer proof on them, and, if in fact the complaint is not broad enough to encompass them, the pleadings should now be deemed amended to conform with the proof. See Fed.R.Civ.P. 15(c).

It is also possible to argue, entirely aside from the state of pleading and proof, that Section 3(c) does not apply at all unless a violation of the Constitution is shown with respect to the very election law or practice that is the principal focus of the complaint. This case was brought to enforce the voting guarantees of the statute and the Constitution with respect to the plan of apportionment adopted in 1981. The argument is that proof with respect to other election laws and practices is certainly relevant under the Senate Report and the *Zimmer* principles, but it comes in only to bolster or rebut either side's case on the main issue: such proof cannot itself be the basis of preclearance. We do not agree with this

reading of the statute. The phrase "violations of the fourteenth or fifteenth amendment justifying equitable relief," which the statute uses as the triggering condition for preclearance, is not limited at all. If, in the course of their attack on the 1981 plan of apportionment, plaintiffs have succeeded in showing other constitutional violations, and if those violations, under equitable principles to be discussed later in this opinion, are sufficiently serious and widespread to justify the drastic remedy of preclearance, we do not think the statute should be read in such a crabbed way as to rule out such relief as a matter of law. Certainly the words of the statute do not require such a reading, and it would be inconsistent with its broad remedial purpose.

### III.

We therefore now propose to discuss each of the other constitutional violations asserted by the plaintiffs. In each instance, it will be our duty to make a finding whether the challenged law or practice was motivated by a racially discriminatory purpose, because, as we have explained above, that is an essential element of a constitutional violation in this context. A number of the claims need be discussed only briefly, because they have already been fully addressed in court opinions, either in our previous opinion in this case, or in opinions in other cases. We have, for example, already found that the statutory regulations affecting the absentee ballot enacted in 1987 were not the result of a racially discriminatory purpose. Therefore, no constitutional violation occurred in connection with the enactment of this law. On the other hand, our previous opinion also found certain local violations, including a racially motivated prosecution in Lee County against Roy Lewellen and racial intimidation in Desha County in 1976 against Carol Willis, a candidate for county judge. (Defendants, incidentally, argue that the acts of local officials cannot be attributed to the State, and that something done by, say, an incumbent county judge is not relevant to the decision whether to impose the preclearance remedy in this case. We reject this argument. Cities, counties, and other local subdivisions are mere creatures of the State. Only the State is sovereign, and it can create or abolish local subdivisions at will. For purposes of the Fourteenth and Fifteenth Amendments, at least in the voting context, it is our opinion that no legal distinction exists between State and local officials.)

Previous cases have resulted in findings of other constitutional violations. We briefly refer to these cases, which are cited and discussed in our previous opinion. *Perkins v. City of West Helena*, 675 F.2d 201 (8th Cir.), *aff'd mem.*, 459 U.S. 801, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982), held invalid as racially motivated the at-large system of election of aldermen in West Helena, a city in Phillips County. And *Sherpell v. Humnoke School Dist. No. 5*, 619 F.Supp. 670, 680–81 (E.D.Ark.1985), *appeal dismissed*, 814 F.2d 538 (8th Cir.1987), reached a similar conclusion with respect to the at-large election of school-board members in the Humnoke School District of Lonoke County.

Plaintiffs also claim a number of constitutional violations that we did not discuss in our first opinion. They may be conveniently divided into two groups: (1) state laws requiring a majority vote for nomination or election to public office; and (2) a variety of local incidents and practices in the area of the State known as the Delta which, plaintiffs say, were intended to and have had the effect of suppressing black political activity.

1. *Majority–Vote Requirements.* The principal majority-vote requirement now in effect in Arkansas has to do with party nominations, rather than elections proper. Under Section 5 of Amendment 29 of the Constitution of Arkansas, candidates may get on the ballot at a general election in one of three ways: by nomination by a party convention; by nomination by a party primary election; or by petition. If a party chooses (and they commonly do) to select its nominees in a primary election, the nominee must receive a majority of all the votes cast at the primary election. So, if there are more than two candidates, and no one receives an absolute majority of all the

votes cast in the first, or preferential, primary, another primary election, known as the run-off or the general primary, must be held. The two top candidates run in this second primary, and the winner becomes the nominee. The statute carrying into effect this constitutional provision is now codified as Ark. Code Ann. § 7–7–202 (1987).

In recent years, such majority-vote requirements have become an issue in the context of minority voting rights. Two kinds of attacks are made. First, it is claimed that such requirements have the effect of reducing minority political opportunity, in violation of Section 2 of the Voting Rights Act. No such claim is before us in this case.[1] Second, it is claimed that majority-vote requirements were either adopted or maintained for the unconstitutional purpose of suppressing or discouraging black political activity. A substantial body of opinion takes the position that "[t]he majority vote requirement has its roots in nineteenth century southern white racism...." McDonald, *The Majority Vote Requirement: Its Use and Abuse in the South,* 17 The Urban Lawyer 429, 429 (1985).[2]

■ There is no substantial reason to believe that the majority-vote requirement in Arkansas was originally enacted to prevent black political success. In many Southern states, majority-vote requirements were instituted at the turn of the century as part of a package of measures designed to disenfranchise black voters.

See *McDonald, supra,* at 430–32. This was not the case in Arkansas. Amendment 29 was adopted by a vote of the people in 1938, after the nomination of Carl Bailey for Governor in 1936 with less than 32% of the votes in the Democratic Primary. (At that time, the Democratic nomination for Governor was the practical equivalent of election, and it still is for some offices.) Blacks had already been effectively disenfranchised by the whites-only Democratic Party primary, then thought to be legal under federal law. The majority-vote requirement was wholly unnecessary for this purpose. We find that Section 5 of Amendment 29 and its implementing statutes were *not enacted for racially invidious purposes.*[3]

Plaintiff also argue that the general majority-vote requirement for party primaries was *maintained* for a discriminatory purpose. After white primaries became unlawful, they say, the State turned to other devices to suppress black political activity, including the poll tax and the run-off primary. We do not so find. The majority-vote requirement is in the state Constitution. The Legislature could not then and cannot now change it. So the argument must be that, after 1944, the people of Arkansas, but for their desire to thwart black political opportunity, would have voted to repeal Section 5 of Amendment 29 and go back to the pre–1938 system of nomination by plurality. We disagree. This argument evinces a fundamental misunderstanding of the history and nature of

---

**1.** In *Whitfield v. Democratic Party of Arkansas,* 890 F.2d 1423 (8th Cir.1989), a divided panel of the Court of Appeals for this Circuit held that the system of majority-vote party primaries in Phillips County, Arkansas, violates Section 2. A petition for rehearing en banc was granted, thus vacating the panel opinion. The case was argued before the Court en banc on April 10, 1990. On May 4, 1990, the Court of Appeals en banc affirmed the judgment of the District Court, 686 F.Supp. 1365 (E.D.Ark.1988), by an equally divided vote. Thus, the *Whitfield* case itself has resulted (so far) in a holding that the majority-vote requirement does not violate the Voting Rights Act.

**2.** Mr. McDonald's excellent article also concludes that "abolition of the requirement would

likely have very little beneficial impact on minorities seeking office in majority white jurisdictions, while it could actually work against the election of blacks in many majority black jurisdictions." *Ibid.* This is a question of policy or political effect which is irrelevant to our present inquiry into motivation.

**3.** For detailed reasoning supporting this finding, see *Whitfield v. Democratic Party of Arkansas,* 686 F.Supp. 1365, 1367–71 (E.D.Ark.1988), *aff'd in relevant part,* 890 F.2d 1423, 1425–27 (8th Cir.1989). This Court's opinion in *Whitfield* also carefully describes the pre–1938 statutory history of the run-off primary in Arkansas. The first statute requiring a majority vote was passed in 1933 and had nothing to do with racial matters.

Arkansas politics. The run-off primary has become a permanent fixture of party politics in this State. It reflects a deep-seated attachment to the principle of majority rule, one of the cardinal pillars of democracy. It was neither instituted nor maintained for racial reasons. As a rule, county, district, and State offices are filled by partisan elections, and for most of them the Democratic nomination is still a virtual assurance of election in November. The run-off primary system ensures that the election will not be determined by a mere plurality of those who vote in a party primary. A similar rule is unnecessary for general elections, because there are almost never more than two substantial candidates in the general election for offices contested by party nominees. We reject plaintiffs' constitutional attack on the run-off system for party nominees.

█ The result is otherwise, however, as to other run-off statutes now on the books, Ark. Code Ann. §§ 7–5–106, 14–42–206, (1987), which apply to general elections for municipal and county offices.[4] Traditionally, municipal offices, including mayor, council member, and municipal judge, were filled by nonpartisan election, conducted at the general election in November. The person receiving the highest number of votes won. A majority was not required. This situation began to change in 1973. In November 1972 P.A. (Les) Hollingsworth, a black lawyer who later served as an Associate Justice of the Supreme Court of Arkansas, was elected to the Little Rock City Board of Directors by a plurality. The General Assembly responded in its next session, enacting Act 168 of 1973, requiring a majority vote for such offices.[5]

In 1975, a vacancy occurred in the office of Mayor of Pine Bluff, and Robert Handley announced his candidacy. The Rev. Mr. Handley, a black man, appeared to be a strong contender. The Legislature acted promptly. In advance of the special election for Mayor of Pine Bluff, it passed Act 269 of 1975, requiring a majority vote.[6] Mr. Handley was defeated in a run-off.

In November of 1982, Leo Chitman became the first black person to be elected Mayor of West Memphis. He ran first among five candidates but did not get a majority of the votes. He unseated a white incumbent. White candidates had won by a plurality in the past, and no legislative reaction occurred. But when Mr. Chitman was elected Mayor in the same way, the Legislature promptly responded. It passed Act 909 of 1983, now codified as Ark.Code Ann. § 7–5–106, to require a majority vote for election to both county and municipal offices.

And finally, in 1988 the Rev. Marion Humphrey, a black lawyer, was elected Municipal Judge of Little Rock by a plurality. Little Rock, see p. 594 n. 4 *supra*, had not been subject to a majority-vote requirement. But after Judge Humphrey's election, the Legislature reacted quickly. It passed Act 905 of 1989, subjecting municipal offices in all cities and towns to a majority-vote requirement. See Ark.Code Ann. § 14–42–206.

We cannot ignore the pattern formed by these enactments. Devotion to majority rule for local offices lay dormant as long as

---

**4.** Section 7–5–106 does not apply to cities having the city-manager form of government. Little Rock is such a city. Under Act 905 of 1989, however, much the same result will occur. Section 14–42–206 of the Arkansas Code, the codification of §§ 1–5 and 8 of Act 905, requires all cities and towns to hold a "municipal primary election." If no one receives a majority at this election, which is to be held on the sixth Tuesday before the general election, the names of the two candidates receiving the highest number of votes will go on the ballot at the general election. Thus, all city offices in Arkansas are now subject to some form of a majority-vote requirement. Act 905 is further discussed at p. 594, *infra*.

**5.** This Act was later invalidated by the Supreme Court of Arkansas on state constitutional grounds. *Mears v. City of Little Rock*, 256 Ark. 359, 508 S.W.2d 750 (1974).

**6.** This Act was later amended to apply only to first-class cities with populations within a narrow limit set by the amendment. Act 175 of 1977. The amended Act was later invalidated by the Supreme Court of Arkansas on state constitutional grounds. *Ferguson v. Brick*, 279 Ark. 288, 652 S.W.2d 1 (1983).

the plurality system produced white office-holders. But whenever black candidates used this system successfully—and victory by a plurality has been virtually their only chance at success in at-large elections in majority-white cities—the response was swift and certain. Laws were passed in an attempt to close off this avenue of black political victory. This series of laws represents a systematic and deliberate attempt to reduce black political opportunity. Such an attempt is plainly unconstitutional. It replaces a system in which blacks could and did succeed, with one in which they almost certainly cannot. The inference of racial motivation is inescapable.[7]

■ 2. *Local Violations*. Finally, plaintiffs argue, citing a large amount of anecdotal and other evidence, that local officials have taken numerous actions for the purpose of thwarting black political opportunity. We have already referred to the 1976 race for County Judge in Desha County and to the 1985–86 Lewellen case in Lee County. A number of other situations and incidents need to be examined.

The most convenient way of discussing the evidence with respect to the claimed local violations is to consider the testimony with regard to each county in the affected area of the State. This method of analysis will prolong this opinion, but the questions are important, and the parties and the public are entitled to detailed findings of fact.

At the outset, we put to one side Pulaski, Jefferson, and Ouachita Counties. No substantial evidence of manipulation of the electoral system by local officials with the purpose of thwarting black political activity was presented with respect to any of these three counties. The evidence with respect to nine other counties deserves discussion, however, and we now describe that evidence.

*Phillips County.* Within two weeks of the 1986 primary election, a polling place for a very large black ward was moved. No personal notice of the move was given to voters. The polling place had been at the Catholic Church, but no notice was placed on the door of the church to indicate the new polling place, the Arkansas Street Fire Station. On the other hand, the move was only a distance of one and one-half blocks, and notice of the move was published in the newspaper. This move confused some voters, and this effect was likely more pronounced among black voters, a group in which the illiteracy rate is higher, but we are not persuaded that the polling places were moved for the deliberate purpose of reducing the black vote. There is no evidence that any different procedures have ever been followed with respect to the moving of polling places, and we believe the incident represents insensitivity to the problems of poor voters, rather than a conscious effort to impede black participation in the political process.

There was also testimony of confusion in the general election of 1986 with respect to "voter aids." This phrase refers to written material, such as sample ballots, that are customarily handed out to some voters immediately before they go to the polls. The use of such "aids" is legal, but it is not legal to electioneer in a polling place, so if voters are observed showing the "aids" to other voters in a polling place, an arguable violation of election laws takes place. In one instance, the Chairman of the Election Commission had instructed an election official to take away the voter aids, claiming that they were being flashed around. After a protest, this instruction was withdrawn. Again, we find no persuasive evidence of discriminatory intent. We note

---

**7.** This does not mean that our decree in this case will enjoin the enforcement of the existing run-off statutes for county and municipal offices. For one thing, the evidence of illicit motivation applies only to municipal elections in portions of the State with substantial minority populations. And for another, plaintiffs at the oral argument at the close of the trial in this case disclaimed any desire for such relief. They bring up the series of municipal run-off statutes only as constitutional violations justifying pre-clearance under Section 3(c). Whether and to what extent these statutes may continue to be validly applied must be left to a case-by-case determination in the future. At least this much, though, can be said: If a black candidate leads in the first election and then is defeated in a run-off required by either Ark.Code Ann. § 7–5–106 or § 14–42–206, the election will be vulnerable to a strong constitutional challenge.

that there are now eleven black members on the Democratic Central Committee for Phillips County, and this is significant, because the Democratic Party runs its own primaries, and also controls two out of the three seats on the County Election Commission, which runs the general elections. There are 20 to 25 volunteer deputy voter registrars in Phillips County, they are permitted to go anywhere in the County to register voters, and none of them has ever been terminated. Nor has anyone ever requested to be made a volunteer deputy and been refused. The volunteer deputies are split almost evenly by race. Although litigation was necessary to produce the volunteer-deputy system, it now seems to be working well.

*Lee County.* At one time, discriminatory interference with black voters in Lee County was widespread. In evidence before us is the report of the Arkansas State Advisory Committee to the United States Commission on Civil Rights, published in March of 1974. PX 59. The report concludes, among other things, as follows:

> [B]lacks in Lee County were discriminated against through the following means:
> 1. the interference of black poll watchers by local law enforcement officials and election officials;
> 2. the tampering of ballot boxes;
> 3. the harassment and intimidation of black voters; and
> 4. the failure of the election commission to provide for adequate accommodations.

PX 59, p. 34.

In an order filed before the trial of this case, we overruled plaintiffs' motion that we take judicial notice of the conclusions contained in the report. The report is in evidence, however, as a report of an official body charged by statute with the responsibility of making findings. See Fed.R.Evid. 803(8); *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988). We find the report persuasive evidence. Similar events, including the attempt to intimidate Roy Lewellen in his race for the Senate, have continued to occur. But there is no doubt that the situation is changing for the better. The prosecuting attorney who was involved in the harassment against Mr. Lewellen is no longer in office. His successor is one of the few white public officials in the State who have publicly endorsed a black candidate for office, and he has appointed a black lawyer, Olly Neal, as deputy prosecuting attorney for Lee County. Another black lawyer, Kathleen Bell, has become a Circuit and Chancery Judge, exercising juvenile jurisdiction. Places that blacks (and some whites) consider inhospitable—for example, a country-and-western nightclub—have been used as polling places, but, as in the case of Phillips County, we are not persuaded that this choice was deliberately designed to reduce the black vote. On the whole, though the question is close, we are not persuaded that there now exist constitutional violations justifying equitable relief. The report of the Advisory Committee describes a situation that is more than 15 years old, and the most recent constitutional violation, the Lewellen case, has been remedied both by a preliminary injunction issued by this Court and by the subsequent withdrawal of the charges.

*Crittenden County.* We heard a great deal of testimony about political conflict in this County, some of it breaking down, in practice, along racial lines because of the prevalence of block voting by both whites and blacks. The conflict revolves around details of election practices, including appointment of election officials, the technicalities of voter registration, purging of voter lists to eliminate voters who have died, moved away, or simply have not voted, and the like. One incident in dispute involved the mailing out of absentee ballots shortly before an election. Some of them were mailed out with insufficient postage, and the charge was made that Sally Brady, the County Clerk (the official in charge of voter registration and related matters), deliberately left off the postage, in order to ensure that the ballots would not be delivered. This incident is a good example of the high level of distrust in political matters between the races in Crittenden County. Each side is willing to believe the worst about the other. In this particular

case, we find no deliberate violation by the County Clerk. She testified that the proper postage was left off by mistake, not deliberately, and we believe her. All of the voters in question eventually got their ballots, and the County Clerk told voters that if they had to pay postage due, she would reimburse them. A black deputy voter registrar was terminated, but Mrs. Brady believed, perhaps wrongly, that she had good cause. A white deputy voter registrar has also been terminated.

Politics in Crittenden County is serious, often rough. Fierce battles between entrenched forces, known to the opposition as a "machine," and challengers are frequent. Some of these battles, but by no means all of them, are racially polarized. Those who are in office defend themselves vigorously. Perhaps they have used the election laws as tools in this fight. Perhaps they have interpreted these laws strictly in order to make political insurgency difficult. We do not believe, however, that this activity is especially keyed to race. White candidates and groups challenging the political establishment face the same hurdles. While we could wish for more trust among citizens, we do not find any present violations of the Fifteenth Amendment justifying equitable relief in Crittenden County.

*Chicot County.* Problems with respect to the location of polling places are similar to those described above in connection with Phillips County. Some polling places have been moved on short notice, and some of them are in places inconvenient to black voters. In this regard, however, we credit the testimony of Kathy Johnson, County Clerk of Chicot County. In her view, good reasons existed, reasons having nothing to do with race, for each change that was made. Greater efforts could be made to locate polling places in areas where black people live, and public officials have a duty to become familiar with all parts of their constituency, so that all parts can be properly served. But we are not persuaded that problems with polling places in Chicot County have been due to intentional racial discrimination.

There were also complaints that the political life of the County is dominated by one white family, the Gibsons. Charles Sidney Gibson is Chairman of the Democratic Central Committee and City Attorney of Dermott. He also serves as Chairman of the County Election Commission, traditionally a position assumed by whoever is Chairman of the Democratic Central Committee. The State Senator, Jack Gibson, sponsored a bill in the Legislature to locate a landfill in the area. The bill was not popular with black citizens, who objected to the landfill's location. We see no constitutional violation, with respect to voting or otherwise, in this incident. In the end, the bill did not pass, in large part because of the efforts of Bynum Gibson, a State Representative. The Gibsons, it seems, like many families, are not so monolithic as they appear to others. In fact, one of the plaintiffs' witnesses praised Representative Bynum Gibson for his responsiveness to voters, including black voters.

Finally, difficulties with regard to "voting booths" were discussed at the trial. Voting in Chicot County is by paper ballot. In some precincts, voters receive their ballots and sit at tables to mark them. It is possible for election officials to look over the shoulders of voters during this process. At some times and at some precincts there are booths that give a measure of privacy, or "frames," apparently some sort of divider between portions of the table at which votes are cast, for the same purpose. The absence of these booths or frames has caused some black voters to feel intimidated, lest their votes should become known. We do not doubt that this can be a serious problem, and election officials should do their utmost to see that the privacy of the ballot is respected. We are not persuaded, however, that these problems are more prevalent in predominantly black precincts than in predominantly white precincts, or that they are the result of an intentional effort to intimidate black voters.

We note also that deputy registrars are now being freely appointed in Chicot County, and this is a development of great significance for the future. There are 12 volunteer deputies, ten of whom are black.

Their ability to register voters is in no way restricted. The County Clerk has never refused to appoint any person who volunteered, nor has she ever terminated any volunteer deputy.

In sum, we conclude that no present constitutional violations with respect to voting rights, justifying equitable relief, have been proved in Chicot County.

*Mississippi County.* Polling places have been moved, and this causes confusion among voters, probably more confusion among black voters than among whites. Some election officials are employers of some voters, and voters fear a lack of privacy. As Lonnie Middlebrook, Jr., a member of the Blytheville City Council, testified, such fear is in itself a form of intimidation. On the other hand, Mr. Middlebrook knew of no instance in which anyone's vote actually became known. This sort of apprehension, resulting from natural fears on the part of those in a position of economic dependence, can be a serious problem, but it seems to us more in the nature of disparate impact than of deliberate discrimination. There was no testimony of any actual threat against a voter.

Many blacks have served as election officials, but they tend not to be appointed to serve at white boxes, while white people are represented as officials at all boxes. But according to JoAnn Morgan, County Clerk of Mississippi County, there is actually a shortage of election officials, and she is seeking volunteers for this purpose. She has never received a complaint from a black person concerning the conduct of a white poll worker. Polling places have been changed, but a list of the changes is printed in the newspaper, and the County Clerk has written many letters to individual voters explaining to them where they should vote. The polling places have also been consolidated for some elections, but this occurs in school elections and special elections conducted on a single issue, when the turnout is traditionally low, so there is a legitimate reason for this consolidation. There are 46 active volunteer deputy registrars, 18 of whom are black. Their movements are not restricted at all, except that

the County is divided into two districts, Osceola and Chickasawba, which means that there are two separate sets of voter-registration books. A deputy registrar is on call at all times in the Social Services office. Ms. Morgan has never turned down any qualified elector who wanted to be a deputy registrar, and she has asked publicly numerous times for volunteers. We find no present constitutional violations with respect to the right to vote in Mississippi County.

*St. Francis County.* Larry S. Bryant, a former member of the City Council of Forrest City, testified about problems experienced in his political races. In 1984, when he was re-elected by a close margin against a white opponent, a 50–vote error was made in the initial count. After Mr. Bryant complained, though, the error was corrected. In 1986, he ran for Mayor and lost. During this campaign, his life was threatened, and he received phone calls using racial epithets and threatening to "blow him away."

These incidents do not amount to constitutional violations. There is no evidence that the telephone calls or threats came from any public official, or anyone acting in concert with or with the knowledge of a public official. Threats of this kind, we agree, are extremely serious, and their significance should not be minimized. They amount to criminal violations of federal statutes designed to protect the right to vote. But in the absence of a showing of state action, they are not violations of the Fifteenth Amendment.

*Desha County.* We have already referred to the campaign of Carol Willis for county judge. We note, in addition, the testimony of his brother, Andrew James Willis. Andrew Willis described an incident at a polling place on election day in 1976. A white election official pulled a knife on him and had to be restrained by others who were present. The police were there, but they made no attempt to investigate the incident. Mr. Willis tried to press charges, but the deputy prosecuting attorney, who was the son-in-law of the incumbent county judge (Carol Willis's opponent),

threatened to charge Andrew Willis with criminal trespass instead. After the election, the family business suffered, partly because of official retaliation by the County.

There have unquestionably been serious constitutional violations with respect to the right to vote in Desha County. There is, however, no evidence of any specific incident more recent than 1976. The county judge who defeated Carol Willis retired early in the 1980s. Registrars have now been appointed, and some of them are black, though this appears to be a relatively recent development. The issue is whether the constitutional violations proved justify equitable relief in the present-day situation. One relevant indication is the improved atmosphere in which Carol Willis's race for circuit clerk occurred, in 1978. This race was free of the racial abuse and flare-ups that characterized the 1976 race. Mr. Willis's white opponent ran a good campaign. The voting patterns were essentially the same as in 1976. We conclude that the need for equitable relief in 1990 has not been proved.

*Ashley County.* We heard the testimony of Clinton Harris, who has been Mayor of Wilmot for three years. In 1976, when Mr. Harris first ran for the Wilmot City Council, his white opponent withdrew because he did not live within the city limits. The town was then rezoned in order to enable another white man to run against Mr. Harris, and this white opponent was elected. Then, in 1986, a group of blacks, acting on their understanding of the law, were helping voters in a polling place. A large gathering of whites began to disrupt the voting. They announced that they were changing the laws at this polling place only, to prevent voters from getting help in this manner. One member of this group physically prevented Mayor Harris from re-entering the polling place. Mayor Harris has also experienced serious difficulties in receiving an appointment as a deputy registrar. He was refused at least eight times, finally obtaining the appointment in September of 1986. He was then able to register 60 people in two days, all

black, and he credits his election victory to that fact.

Mayor Harris's testimony was not rebutted. We found him believable. We therefore find that there have been constitutional violations of the right to vote in Ashley County. Many of the people who took part in the 1986 incident described above were private citizens, but the Sheriff of the County apparently cooperated with them, as did the Election Commission, which is all white. Whether this is the sort of proof that would justify the remedy of preclearance, is a question we shall discuss later in this opinion.

*Columbia County.* The Reverend Ellihue Gaylord, Sr., State President of the NAACP and a member of the organization's national board, testified about political conditions in Columbia County. Before 1982, he said, "we tried" to be appointed deputy registrars, but the County Clerk "turned us down." Suit was filed, and as a result the Reverend Mr. Gaylord and two other black people were deputized. There are now 12 deputy registrars in the County, 11 of whom are black, and their efforts have registered over 3,000 voters since 1982. There is no real evidence in this testimony of any constitutional violation, and we find none.

### IV.

The facts we have found in this and our prior opinion set the stage for the question we must now answer: Should the State or any part of it be subjected to preclearance? The governing words of the statute, 42 U.S.C. § 1973a(c), are these: if "the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting" may be changed without preclearance. "Preclearance" means either a finding by this Court that the qualification, etc., does not have

the purpose and will not have the effect of denying the right to vote on account of race or color, or in contravention of the Voting Rights Act, or a failure by the Attorney General of the United States to object to the qualification, etc., within 60 days.

■ We agree with plaintiffs that both State and local violations of the voting guarantees of the Fourteenth and Fifteenth Amendments must be taken into account. The statute does not say that the State or its officials must be guilty of the violations, but only that the violations must "have occurred *within the territory*" of the State. (Emphasis ours.) And besides, as we have already held, officials of local governments are State officials for present purposes; local governments are arms of the State and exist only at its sufferance. We also think that more than one violation must be shown. The statute uses the plural ("violations"), and it would be strange if a single infringement could subject a State to such strong medicine.

Beyond that, authority is scant. We are aware of no reported case discussing the standards for imposing preclearance. Indeed, there seems to be no case in which a court has subjected an entire State to preclearance (which is what plaintiffs request here, at least as their first choice), with the exception of *Sanchez v. Anaya*, Civ. No. 82–0067M (D.N.M.) (three-judge court) (decree entered December 17, 1984). There, the Court found the State's legislative apportionment in violation of the Voting Rights Act and required preclearance of any new redistricting plan for a period of ten years. Preclearance was not required as to any other voting laws or practices, so the case seems to indicate that preclearance, if it is to be imposed at all, need not be an all-or-nothing proposition. On the other hand, the final judgment was entered by stipulation, a circumstance which reduces its weight as a precedent.

■ There have unquestionably been some constitutional violations (plural) in Arkansas, even if the inquiry is limited to recent times. The series of four majority-vote statutes passed to convert to a run-off system those plurality elections in which blacks were succeeding, establishes this beyond a doubt. Is preclearance then mandatory under the statute? It could be read that way. It says that if violations justifying equitable relief have been shown, the court "shall" retain jurisdiction, and preclearance shall apply during the period for which jurisdiction is retained. Plaintiffs have not requested equitable relief with respect to these particular majority-vote statutes, except for preclearance itself, but equitable relief in the nature of an injunction or a declaratory judgment would clearly be justified, especially to prevent the statutes from being used in the future to deprive a black candidate receiving a plurality of the office for which he or she was running.

We do not think that the word "shall" should be read to strip us of all discretion.[8] It is standard doctrine that statutes stating that courts "shall" grant equitable relief upon the occurrence of a certain state of affairs are not literally construed. Rather, such statutes are interpreted against "a background of several hundred years of history." *The Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944) (Section 205(a) of the Emergency Price Control Act of 1942, 56 Stat. 23, providing that an injunction "shall be granted" if someone has engaged in or is about to engage in a violation of the statute, held not to override traditional principles of equitable discretion.)

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distin-

8. Counsel for plaintiffs, if we understood them correctly, disclaimed in open court the position that the word "shall" has the effect of removing all discretion. They took the same position in their post-trial brief, p. 75: "a State as a whole *may* be placed under preclearance if" constitu-

tional violations are found. (Emphasis ours.) They also indicated a willingness to accept the exception from preclearance of local changes in jurisdictions without a substantial minority population. *Id.* at 75, 77–78.

guished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied.

*Id.* at 329–30, 64 S.Ct. at 591–92. Section 3(c) of the Voting Rights Act, moreover, does not establish "violations" *simpliciter* as the predicate for preclearance, but "violations *justifying equitable relief.*" (Emphasis ours.) It is at least a permissible construction of this language, if not a required one, that whatever relief is granted, including preclearance, must be measured against traditional equitable remedial principles. So "we resolve the ambiguities of Section [3(c)] in favor of that interpretation which affords a full opportunity for equity courts to treat enforcement proceedings under this ... legislation in accordance with their traditional practices, as conditioned by the necessities of the public interest which Congress has sought to protect." *The Hecht Co. v. Bowles, supra,* 321 U.S. at 330, 64 S.Ct. at 592.

What criteria should guide us in the exercise of this discretion? Without meaning to exhaust the universe of possibly relevant factors that might be shown in future cases, the present record suggests the following: Have the violations been persistent and repeated? Are they recent or distant in time? Are they the kinds of violations that would likely be prevented, in the future, by preclearance? Have they already been remedied by judicial decree or otherwise? How likely are they to recur? Do political developments, independent of this litigation, make recurrence more or less likely? Throughout the weighing process, we have in mind the strong interests on both sides: the interest of the plaintiffs in vindication of their constitutional right to vote, perhaps the most precious of all political rights except that of free speech itself, and the interest of the defendants in maintaining the sovereignty of the State, which is itself an important part of the constitutional balance against the exercise of arbitrary power by any portion of government, national or state. Above all, we are mindful that both the Constitution and the Voting Rights Act require that if violations have been found, and if prospective relief in the form of preclearance is indicated by the other factors in the case, the rights of the plaintiffs must prevail. The whole purpose of the Fourteenth and Fifteenth Amendments and of the Voting Rights Act is to override state action, and undue deference to state sovereignty cannot be permitted to thwart this purpose.

■ Having fully considered all of these factors in the light of the entire record, we conclude that a limited preclearance remedy is required. Certain of the constitutional violations found, including those shown by the *Perkins, Humnoke,* and *Lewellen* cases, have already been remedied by judicial action. A consent decree now requires the ready appointment of deputy voting registrars, and black people are amply represented in these appointments. There have been no violations of this consent decree. The widespread violations found to exist in Lee County in the 1974 report of the Advisory Committee to the Civil Rights Commission are, at least in large part, a thing of the past. The same is true, to some degree, of the local violations we have found in Ashley and Desha Counties. Moreover, these violations consist, in the main, not of explicit elections laws or practices, but rather of individual actions by officials charged with administering laws and practices neutral on their face. This kind of violation would not be affected by a preclearance requirement and therefore furnishes no strong basis for imposing it. The series of majority-vote statutes passed for the purpose of suppressing black political success, however, demands strong action. We therefore hold that any further statutes, ordinances, regulations, practices, or standards imposing or relating to a majority-vote requirement in general elections in this State must be subjected to the preclearance process. (The majority-vote requirement for nomination in party primaries is not affected by this holding.) In all other respects, plaintiffs' request for statu-

tory preclearance under Section 3(c) will be denied. It would perhaps be within our discretion to impose statutory preclearance on a broader basis, but for the reasons given we have chosen not to, at least for the time being. In making this choice, we take into account, in addition to the other factors mentioned, that the pace of political change in this State is quickening. We credit, in this regard, the testimony of Governor Clinton at the trial. We also note an increasing trend, taking place in many areas of the State, of conversion of at-large election systems to single-member systems. This trend is evident in litigation affecting school-board elections and municipal elections. It was already positive law with respect to elections for quorum courts, the legislative bodies of counties.

We deem it appropriate to impose one further item of relief in the nature of preclearance, not as a matter of statute, but as a matter of inherent equitable power. After the 1990 Census, the Board of Apportionment will face once again the task of drawing district lines for the House and Senate. We direct that no plan of apportionment · so adopted may go into effect until 60 days have elapsed from the date of its final adoption by the Board. This Court will retain jurisdiction, within that time period, for the purpose of entertaining any challenge by the plaintiffs in this case to such plan. If no such challenge is forthcoming, the plan may go into effect, subject, however, to the right of any aggrieved citizen to challenge it in an appropriate action at a later time. This retention of jurisdiction is not required by Section 3(c) of the Act, but plaintiffs have requested it, in the alternative, and we believe it is appropriate under the facts of this case. In fact, such a period of vulnerability, so to speak, should work to the advantage of the State, because if the plan adopted in 1991 survives this hurdle, the chances of its being allowed to govern undisturbed until the Census of 2000, will be, as a practical matter, greatly enhanced.

An appropriate decree is being entered today to carry out the findings and conclusions expressed in this opinion.

It is so ordered.

EISELE, Chief Judge, dissenting.

*Introduction*

While throughout the world the people of nation after nation are rejecting the idea of minority rule, we today find a United States district court holding that the State of Arkansas may be punished for its perceived motive in adopting laws which give expression to that most basic of democratic principles: majority rule.

As I see it, my brothers, in their construction and application of the law and the Constitution, are unconsciously leaning over backward in their sincere effort to help those believed to be the victims of racial discrimination. And when one leans over backward, one is likely to fall, and, when one falls, others in the way will likely be hurt. That is what I see happening here.

By finding certain state run-off election laws violative of our federal Constitution, even though the legislative histories and the intent of these state enactments remain undeveloped and their discriminatory effects undemonstrated, the decision today occasions an even greater wrong than the one it seeks to remedy by casting a chilling and dark shadow over the erstwhile revered concept of majority-rule. The Court is wrong in believing that it has such power and authority. It is wrong in its assessment of the legislative motive for the enactment of these statutes. And it is wrong in its decision to impose the draconic sovereignty-denying remedy of preclearance. I dissent.

*Preliminary Summary*

While I agree with some of the majority's findings and conclusions, I dissent from its major holdings as set forth in its latest opinion in this voting rights case. On this occasion, the issues before the Court are the alleged violations of the Fourteenth and Fifteenth Amendments and, if such violations are found to have occurred, then the remedy to be imposed. I agree with the majority on the correct standard of review for violations of these Amendments and with the majority's find-

ing that the defendants did *not* violate the Constitution in formulating the 1981 redistricting plan. My colleagues have concluded that the enactments by the Arkansas General Assembly of four majority-vote requirement statutes violated the Constitution. I vigorously dissent from those conclusions, but I also point out that, even if the factual record in this case permitted same (which it does not), that record would not constitute a proper predicate for *any* relief in this case—much less the harsh and rarely used remedy of preclearance!

It is clear to me that these majority-vote statutes are not, and have never been, properly before the Court as independent bases for the remedy of preclearance. And I am convinced that the defendants were not fairly on notice that any claim was being made that the enactments of such statutes constituted independent bases for such relief. I also do not believe that there is sufficient evidence of racial animus surrounding the passage of these statutes to justify the conclusion that the enactments thereof violated the Fourteenth or Fifteenth Amendments. And, even if there were, it is my further opinion that under our United States Constitution, federal courts have no authority to prohibit or punish the enactment by the state of such run-off statutes. Nor did Congress intend that federal courts have such power. And, disturbingly, while the majority's opinion undermines the State's decision to require election by a majority rather than a plurality, it at the same time provides no clear, principled guidance to voters, candidates or legislators as to the effect of using the challenged statutes in future elections. My views on these matters are strong and I set them out at length.

## I. AGREEMENT ON CRITICAL CONSTITUTIONAL ISSUES

I will first indicate in more detail the areas in which I find myself in agreement with the majority. I concur with the conclusion that proof of conscious intent to discriminate on racial grounds is required to show a violation of the Equal Protection Clause of the Fourteenth Amendment, and also with the conclusion that the same proof is required under the Fifteenth Amendment. Judge Arnold has thoroughly canvassed the cases in this area. As he notes, the critical Supreme Court opinion, *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), is a plurality decision. I nonetheless agree that more justices adopted the intent standard than opposed it. I also agree that racial discrimination need not be the sole motivation; it need only be one of the motivating factors but for which the action would not have been taken.

I also concur as to the finding that plaintiffs have failed to carry their burden of proving intentional discrimination in the formulation of the redistricting plan in 1981. I would go one step further on the evidence and find affirmatively that racial discrimination was *not* one of the motivating factors in the formulation of that plan. I believe that the members of the Board were primarily driven by the "one person, one vote" requirement, the traditional factors which they identified as their principles of reapportionment (including the protection of incumbents [1]) and simple inertia.

I agree with the majority's factual finding that the Board was not motivated by any intention to harm black voting rights. But I also agree that the Board did not affirmatively seek out ways and means to enhance minority voting power. At the same time, I would find that the Board did not "in fact" dilute black voting rights in the 1981 redistricting plan. Dilution assumes some benchmark. There was no showing that the 1981 plan decreased black voting power from that which existed under the 1971 plan (with the possible exception of H.D. 100). See *Jeffers v. Clinton*, 730 F.Supp. 196 (E.D.Ark., 1990) (Eisele, J.,

---

**1.** See *McMillan v. Escambia Co.*, 638 F.2d 1239, 1245 (5th Cir.), *cert. dismissed*, 453 U.S. 946, 102 S.Ct. 17, 69 L.Ed.2d 1033 (1981), *vacated in part*, 688 F.2d 960 (1982), *vacated and remanded*, 466 U.S. 48, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984):

[T]he desire to retain one's incumbency unaccompanied by other evidence ought not to be equated with an intent to discriminate against blacks *qua* blacks.
*Id.* at 1245.

dissenting). And, even assuming that deliberate indifference to black group voting power were the legal equivalent of intentional discrimination—which it is not—I would conclude that there is no evidentiary basis for the finding of any "knowing failure to correct dilution" because, as I understand the evidence, the defendants did not know that there was any "dilution" to be corrected or even that they might be *"diluting* black voting rights" simply by not taking the opportunity to enhance black group voting power, i.e., by not taking the opportunity to create super-majority black voting age population (VAP) districts.

And so, I fully agree with the majority's holding, "that the 1981 plan of apportionment did not violate either the Fourteenth or Fifteenth amendments." Majority op. at 591. In my view this holding completely disposes of the issues remaining in the case and requires the dismissal of the plaintiffs' constitutional claims and the denial of all remedies based thereon. The majority believes otherwise. It looks for, and finds, other constitutional violations and then uses them as a predicate for preclearance.

## II. ARE THESE OTHER CONSTITUTIONAL ISSUES PROPERLY BEFORE THE COURT?

In the majority's view, a determination that the 1981 apportionment was not motivated by invidious discriminatory intent does not preclude further inquiry into whether preclearance under Section 3(c) may nonetheless be imposed on the basis of "[o]ther alleged constitutional violations" found within the State of Arkansas even though they were not the focus of plaintiffs' complaint. *See* Majority op. at 591. The majority finds as the predicate for "limited preclearance" the enactment of four majority-vote election laws applicable to municipal and county-wide offices. The majority reaches this conclusion despite the fact that the plaintiffs' suit clearly focused not on these statutes (only one of which was in effect when the suit was filed), but rather upon the 1981 apportionment, and despite the fact that this rationale for imposing the admittedly drastic remedy of

preclearance was never raised by the plaintiffs before or during the trial of this case.

### A. *Preclearance Under the Voting Rights Act of 1965*

Section 5 of the Voting Rights Act of 1965 makes a legislative finding that voting rights violations occurred in states where literacy tests were in effect in November of 1964 and where voter turnout in the presidential election of 1964 was less than 50 percent of the voting age population. States automatically "covered" by this provision were affected in several ways under the scheme contained in § 4(b) of the Act. All literacy tests were suspended for a period of five years; federal election observers could be dispatched to monitor elections; and most significantly, the affected political subdivisions were required to submit all new "voter qualification[s] or prerequisite[s] or standard[s], practices[s] or procedure[s] with respect to voting" to the District Court for the District of Columbia or to the Attorney General for "preclearance." *See* 42 U.S.C. § 1973b. Any such proposed change can be implemented only upon a finding by that court or the Attorney General that the provision is not violative of the Act. The entire territories of seven states, as well as portions of several others met the two pronged test and were, therefore, subjected to the strictures of Section 5. *See* S.Rep. No. 94–295, Voting Rights Act of 1965—Extension, 94th Cong. 1st Sess. (1975), *reprinted in* 1975 U.S. Code Cong. & Admin.News 774, 778.

Section 3(c) provides for similar, though not identical, remedies, which are to be imposed by district courts on states or their units where voting related violations of the Fourteenth or Fifteenth Amendments are shown. Preclearance under Section 3(c) is granted by the local district court, which then retains jurisdiction "for such period as it may deem appropriate." 42 U.S.C. § 1973a(c) (1981).

Section 3(c) applies specifically to those "pockets" of discrimination that exist outside those jurisdictions that were automatically covered by the provisions of Section 5.

Under Section 3(c), constitutional violations are not presumed; they must be proved.

> The "pocket trigger" provision does not utilize the automatically-presumed-discriminatory approach pioneered in sections 3(b), 4(a) and 5. Instead these alleged discriminatory "qualifications, prerequisites, etc." retain the "traditional case-by-case approach."

*Brown v. Board of School Comm'rs of Mobile City, Ala,* 542 F.Supp. 1078 (1982) (quoting [1965] U.S.Code Cong. & Ad.News 2437, 2475).

The Section 3(c) preclearance remedy has remained practically unused since the passage of the Voting Rights Act 25 years ago. *Cf. McMillan v. Escambia County,* 559 F.Supp. 720 (N.D.Fla.1983); *Sanchez v. Anaya,* Civ. No. 82–0067M (D.N.M.) (three-judge court) (decree entered by stipulation December 17, 1984). No court has yet articulated standards for its imposition. Never has an entire state, or even most of a state, been subject to its strictures. I submit that this is essentially an issue of first impression. Circumspection should be the order of the day.

### B. *Interpreting the Language of Section 3(c)*

First, I believe that Section 3(c) cannot be read to apply unless violations of the Constitution are shown with respect to the very standard, practice or procedure that is actually being challenged in the lawsuit. Here, the electoral device at issue was the 1981 redistricting plan. Since the court has found no constitutional violations with respect to that apportionment, there is simply no predicate for preclearance under Section 3(c).

The majority contends that Section 3(c)'s reference to "violations of the fourteenth or fifteenth amendment justifying equitable relief" is "not limited at all." Majority op. at 592. Not so.

> Section 3(c) reads in relevant part:
>
> If in any proceeding instituted by the Attorney General or an aggrieved person under any statute to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred within the territory of such State or political subdivision, the court, in addition to any such relief as it may grant, shall retain jurisdiction for such period as it may deem appropriate and during such period no voting qualification or prerequisite to voting or standard, practice, or procedure with respect to voting different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or [language minority status].

42 U.S.C. § 1973a(c).

The use of the plural "violations" and the additional qualification that such violations "justify[ ] equitable relief", clearly reflect congressional reluctance to impose preclearance lightly. It is my opinion that those violations must arise out of the very proceeding "to enforce the voting guarantees of the fourteenth and fifteenth amendments ..." which is referred to in the initial phrase of the statute. Why? Because the statute goes on to say that if in such proceeding the Court "finds that violations of the fourteenth or fifteenth amendment justifying equitable relief have occurred ..." then "the court, in addition to such relief, shall retain jurisdiction...." and impose preclearance. So, here, the Court must find constitutional "violations" (i.e., not just one) in the challenged redistricting plan "justifying equitable relief," (i.e., justifying ordering, for example, a new plan or at least some changes in the 1981 redistricting plan). If the Court finds such constitutional violations justifying such relief, then "in addition" the Court *must* ("shall") impose preclearance.[2]

---

**2.** The majority, by concluding that preclearance may be ordered for even non-major violations, is led also to conclude that "shall" means "may." I disagree. If the statutory predicates are found

The suggestion that the plaintiffs here need not prove their claim that the defendant Board committed violations of the Constitution in formulating the 1981 redistricting plan (and thereby obtain equitable relief) as a condition to entitlement to preclearance is further negated and undercut by the statutory language that the "court *in addition to such relief* shall retain jurisdiction . . ." If no other relief for constitutional violations has been awarded, clearly there is no preclearance. And the parallelism in the use of the phrase "in any State or political subdivision" and the language "within the territory of such State or political subdivision" cannot be ignored. The statute states that "If in any proceeding . . . to enforce the voting guarantees of the fourteenth or fifteenth amendment in any State or political subdivision the court finds that violations . . . have occurred within the territory of such State or political subdivision, the court . . . shall (impose preclearance)." So I submit that the most reasonable and fair construction of Section 3(c) requires that plaintiffs succeed on their basic challenge before any consideration can be given to the remedy of preclearance.

If the majority is correct, would it not follow that a cause of action for preclearance could be stated without, at the same time, attacking some standard, practice or procedure as a violation of the voting guarantees of the Fourteenth or Fifteenth Amendment? For example, assume plaintiffs filed this lawsuit in January 1989, simply claiming that the enactments of these four run-off statutes violated such provisions of the Constitution and praying only for the relief of preclearance (i.e., not claiming that the run-off statutes violated Section 2 and praying for any equitable relief). Could such a complaint survive a motion to dismiss? Although the majority opinion here states that equitable relief would be justified here, it does not go on to grant any such relief in connection with the four run-off statutes. It is my opinion that

Section 3(c) would not form the basis for such a cause of action. Simply alleging, and proving, that violations of the Fourteenth and Fifteenth Amendments "have occurred within the territory of such State" would not be enough, alone, to justify preclearance. Why is that not clear?

But the majority apparently disagrees, concluding that if, in the course of an attack upon an apportionment plan, plaintiffs put on evidence of *other* constitutional violations, such other violations may independently constitute the predicate for "the drastic remedy of preclearance." Summarizing on this point, the majority states:

> [W]e do not think the statute should be read in such a crabbed way as to rule out such relief as a matter of law. Certainly the words of the statute do not require such a reading, and it would be inconsistent with its broad remedial purpose.

Majority op. at 592.

As just explained, it is my view that a straightforward reading of the statute requires the denial in this case of the preclearance remedy as a matter of law. It is the majority that tortures the statute in what appears to be quest for some justification to impose preclearance. None exists in this case.

### C. *The Due Process Issue of Notice*

Furthermore, it does not require a "crabbed" reading of the statute or its purpose to conclude that principles of fair notice and due process require plaintiffs to set forth and specify *before* trial each and every electoral structure being attacked, which they contend justify the imposition of any remedy and particularly the draconic remedy of preclearance. Plaintiffs failed to do this. Nor do I believe is it reasonable to conclude that the defendants were nevertheless fairly on notice of such a theory.

This failure to accord the defendants their constitutional right to procedural due

---

by the Court to have been established, then, barring constitutional problems, preclearance *must* be imposed. And the statutory predicates must be *constitutional* violations, not merely statutory violations. So the Court's finding of

Section 2 violations here, which justify equitable relief, would not be enough. It must find "violations of the fourteenth or fifteenth amendments justifying equitable relief."

process may be the single most serious error in this case if for no other reason than it has been the occasion for so many of the other errors.

The majority states that, "at least since the time of the pretrial conference ... it has been clear that plaintiffs did attempt to prove a pattern of statutory and constitutional violations of their voting rights." Majority op. at 591. The majority goes on to say:

> All of the issues were on the table before trial, defendants had a full and adequate opportunity to offer proof on them, and, if in fact the complaint is not broad enough to encompass them, the pleadings should now be deemed amended to conform with the proof.

*Id.* at 591.

I strongly disagree. The pleadings make no mention of the majority vote statutes now being relied upon as a predicate for preclearance. Having reviewed the record of the pretrial conference, I must also conclude that there was clearly no agreement about this issue or any understanding as to the significance of proving these "other constitutional violations." In short, this issue was not placed on the table even at that late date.

Much of the pre-trial conference held on September 28, 1989 focused on plaintiffs' various requests for judicial notice. Early in the conference, I posed the following question to one of the attorneys for the plaintiffs: "It is, I guess, dilution and districting that we're dealing primarily with as the structure you're attacking." Counsel responded: "Yes, your Honor."

Later in the conference, a question was raised concerning whether a transcript of plaintiffs' expert witness testimony in *Whitfield v. Democratic Party of the State of Arkansas*, 686 F.Supp. 1365, 1368 (E.D.Ark.1988), *aff'd*, 902 F.2d 15 (8th Cir.

1990) (en banc), would be admissable under a hearsay exception in view of certain Department of Justice regulations that purportedly prevented the witness from testifying again in the trial of this case.

In explaining their objections to the use of the transcript, defendants' counsel stated that he "never considered run-off statutes to be an issue in this case." This appeared to go toward the testimony's relevance, rather than the question of hearsay. As to the latter objection, the Court ruled in plaintiffs' favor. But the statement of counsel is strong indication of the defendants' lack of notice that run-off provisions would be used to independently establish a predicate for preclearance. Moreover, it must be remembered that the election law at issue in *Whitfield*, and the focus of the expert's testimony, and therefore the likely focus of the parties at the pre-trial conference, was *not* the run-off provisions which the majority has now found should serve as a legal basis for preclearance.

But this was the only discussion of run-off provisions at the pre-trial conference. The plaintiffs did request that the Court take notice of judicial findings in other cases of constitutional violations in the State. In doing so, they explained that these cases were relevant to their claim under Section 3(c), and specifically would be used to establish a pattern of local constitutional violations in Arkansas. However, plaintiffs did not contend that these findings could serve as a predicate for preclearance independent of the Court's ruling with respect to the 1981 apportionment. And the majority concedes that these earlier judicial findings would not justify preclearance since the effects of any such violations have ceased or have since been remedied. Majority op. at 601.[3]

---

**3.** Because the majority concludes that none of the other constitutional violations except the run-off statutes constitute a proper basis for preclearance, I have chosen not to carefully review the majority's analysis thereof for the purpose of indicating wherein I agree and disagree with that analysis. Suffice it to say I do not completely agree with the majority's factual

analyses. However, I do agree with its legal conclusion that no such violation or violations can or should constitute a legal basis for preclearance here. Some specific points should, however, be made. In dealing with "local violations," the majority states that there should be no distinction between the acts of state and local officials. I disagree. The state may not be

Finally, the submissions of the parties both before and after the trial clearly reveal that the issue whether constitutional violations, independent of the apportionment challenge, could serve as a predicate for pre-clearance, was never brought into focus, implicitly or otherwise. For instance, the proposed findings of fact and conclusions of law filed by both parties simply outlined the appropriate standard necessary to establish a constitutional violation. Defendants concluded that plaintiffs "have the burden of establishing intentional discrimination or a disproportionate effect in the establishment and maintenance of the *challenged apportionment plan.*" Defendants' Proposed Findings of Fact and Conclusions of Law at 11 (emphasis added). They then proposed that the Court find that no racial animus accompanied the 1981 apportionment plan, and therefore, "Arkansas cannot be placed under the preclearance requirement of Section 3(c) of the Voting Rights Act." *Id.,* at 14–15. At no point do the defendants indicate in their pre-trial submissions that they were aware that plaintiffs would attempt to show that preclearance could be imposed in the absence of a finding that the apportionment was carried out with the intent to discriminate against blacks.

More importantly, the plaintiffs' pre-trial conference information sheet does not list this as an expected issue of law to be contested at trial. Nor are the citations for any of the now-challenged runoff statutes ever mentioned in the pre-trial submission of the plaintiffs. It must be noted that during the pre-trial conference, plaintiffs requested that the Court take judicial notice of some 43 items ranging from earlier judicial findings of racial discrimination to allegedly race-based enactments passed by the Arkansas General Assembly from the end of the Reconstruction era to the present. At no time did the plaintiffs identify, or request that the Court take judicial notice of the existence of the majority-vote statutes that now serve as the basis for imposition of preclearance.

On the first day of trial, plaintiffs presented the Court with a list of 67 exhibits that they intended to offer. These were then received subject to later objections from the defendants. Again, the majority-vote statutes were not among the exhibits offered.

It was not until the trial commenced that the run-off statutes became the focus of some testimony. Even then, however, the manner in which these provisions are referred to is instructive on the question whether defendants had adequate notice that these provisions would be tendered as predicates for preclearance. For instance, on the fourth day of trial, State Representative Irma Hunter Brown testified that she and several other black legislators looked upon a run-off bill introduced in early 1989 with a "jaundiced eye" because the bill was introduced shortly after the plurality election of the Honorable Marion Humphrey to the post of Pulaski County municipal court judge. TR. at IV–50. The bill to which she referred was never cited by either the witness or counsel. Toward the end of her testimony, the following colloquy occurred:

---

penalized for the isolated and unconnected incidents of bad behavior on the part of local officials. Furthermore, if the violations are to rise to the level of a "policy or practice," there should be evidence of a series of related incidents involving similar conduct over which the state would have some lawful control.

And, while not choosing to rely thereon, the majority has cited prior judicial decisions as evidence of prior constitutional violations while completely ignoring the many court decisions finding such constitutional claims to be without merit. Section 3(c) does not permit such "bootstrapping" to be used as a basis for preclearance.

Furthermore, many of the "local violations" discussed by the majority consisted of the actions of private citizens unconnected to either state or local governmental action. The majority states at p. 600 of its opinion:

> The statute does not say that the state or its officials must be guilty of the violations but only ... the violations must "have occurred *within the territory* of the state.

I believe this analysis to be wrong. Violations of the Fourteenth and Fifteenth Amendments require a state action. If the state is not guilty of violations, then no violations of the Fourteenth or Fifteenth Amendments can occur.

So, again, the only *state* action which the court can rely upon here is found in the enactment of the four runoff statutes.

Q  Do you believe that the run-off primary bill was passed in response to a particular election?

A  I can only repeat what I said earlier. I thought it was suspect in that we had just had the election of Judge Humphrey and it became a main bill that was introduced.

JUDGE ARNOLD: Did the bill pass?

THE WITNESS: It passed city, county, local [committee] and I believe it ultimately passed the House, yes.

JUDGE ARNOLD: Did it become law?

THE WITNESS: I'm not sure. I don't think it did. I think it fell somewhere between the Senate and the Governor's office. I think that's what happened. I'm not sure.

TR at IV–57.

Two days later, Judge Humphrey testified that when he ran for municipal judge, there were no majority-vote requirements, but that it was his "understanding" that such requirements had been enacted since the election. TR at p. VI–104. Pressed for details about the run-off provision, Judge Humphrey said he was only informed about the passage by his elected state representative. Then the following:

JUDGE ARNOLD: Did another witness testify that the bill did not pass?

MR. HOLLINGSWORTH: Your Honor, I think we had Representative Brown on the stand and her testimony was that she did not think—that she did not know whether or not it had passed. She did know it had been introduced.

JUDGE ARNOLD: All right. Will you nail that down for us?

MR. HOLLINGSWORTH: We've been trying to, Your Honor, and we just can't run it down. We will continue to try to accomplish that.

TR at p. VI–105.

On the following morning, plaintiffs' counsel offered as an exhibit a copy of Act 905 of 1989, codified as Ark.Code Ann. § 14–42–206. Counsel identified it as the run-off statute that Judge Humphrey, and presumably Rep. Brown, had referred to earlier. TR at p. VII–3. The copy was marked as Plaintiff's Exhibit 71, and received by the Court. As far as I can tell, this was the first time any of the four run-off statutes was specifically cited to the Court, and the only such exhibit offered by the plaintiffs. At this point, the trial had entered the seventh day of what would be twelve days of testimony.

Aside from the manner in which these run-off laws were introduced, it must also be noted that plaintiffs' pre-trial brief likewise never contended that the statutes could independently serve as a predicate for preclearance. Instead, plaintiffs focused on the discussion of the factors relevant to a determination that the 1981 apportionment had been implemented in violation of Section 2 and the Constitution. In that context plaintiffs noted the existence in Arkansas of so-called "discrimination-enhancing" majority vote requirements. Plaintiffs at no point suggest any more than that the Court consider the existence of these statutes as relevant under the *Zimmer*[4] or Senate factors to plaintiffs' attack on the apportionment. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 43 par. 141.

Given the scant law on Section 3(c) in general, and the complete absence of any previous cases on this issue in particular, plaintiffs should have placed defendants on notice by explicitly stating that they would request imposition of preclearance regardless of the Court's ultimate finding with respect to the 1981 apportionment. Plaintiffs did not do this. Moreover, their post-trial brief indicates that such a theory of relief was advanced primarily in response to the Court's questions during closing argument. Plaintiff's Post-trial Brief at 115.

Under these circumstances, I do not think that there is any basis for permitting the pleadings to be deemed amended to conform with the proof. I do not believe that this issue was "tried by express or implied consent of the parties," as required by Fed.R.Civ.P. 15(b). Clearly, the defen-

---

4. *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973), *aff'd. sub nom., East Carroll Parish*

*School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976).

dants were vigorously resisting the pre-clearance remedy. Had they realized that the plaintiffs were advancing this theory, or that the Court was, on its own, seriously entertaining same, it is entirely reasonable to assume that the issues concerning the enactment of the run-off statutes would have been aggressively tried out, thereby providing the Court with an adequate evidentiary basis upon which to make its findings. Frankly, I confess to the feeling that the defendants have been bushwhacked on this issue. A careful examination at the evidentiary record would, I submit, convince any lawyer that constitutional challenges to these four run-off statutes simply were not tried out. To decide such important issues in such an evidentiary vacuum invites the possibility of serious embarrassment should the Court's assumptions prove wrong. That potential embarrassment can easily be avoided by insisting that the usual and ordinary due process standards be followed here.

I conclude that the defendants' constitutional right to procedural due process has been violated here, and the cost (measured in terms of the sacrifice of potential accuracy of factual findings) has been visited not only upon the defendants but upon all the citizens of this state.

## III. THE "OTHER" CONSTITUTIONAL VIOLATIONS: MAJORITY VOTE REQUIREMENTS

### A. *Majority–Vote Statutes—Sacred Ground*

In my dissenting opinion on plaintiffs' Section 2 claim, I included a section captioned "Constitutional Limitations: Use of 'Republican Form of Government' Guarantee of Article IV Section 4, U.S. Constitution." *Jeffers v. Clinton, supra,* 730 F.Supp. at 232. I now incorporate that section herein by reference. My conclusion there, and here, is that there are certain voting practices and standards that are protected from any attack by our United States Constitution. The four run-off statutes relied upon by the majority of the judges of this Court as a basis for imposing preclearance establish just such protected standards—which I will here refer to as "sacred ground."

It is my opinion that if majority rule is not *required* by the Constitution as part and parcel of the "Republican Form of Government" which is guaranteed by Article IV Section 4 "to every State in this Union," such majority rule principle certainly may not be prohibited or enjoined for any reason. Nor, in my opinion, may the enactment of any such run-off statute be made the basis for punishing any state or limiting any state's sovereign power, regardless of the motive or motives for such enactment and regardless of the effect such statutes may have upon any individual or any group of individuals. (Of course, it is my further view, as explained elsewhere herein and in my earlier decisions in this case and in *Whitfield,* that such run-off statutes, properly analyzed, have no discriminatory effects.)

Here, while the majority does not enjoin the enforcement of such statutes, it finds that the enactments thereof violated the Fourteenth and Fifteenth Amendments and that such violations under Section 3(c) may be used to punish the State of Arkansas by limiting its sovereignty through the imposition of preclearance. It is my opinion that the enactment of such run-off statutes did not and cannot cause any violation of our Constitution. It is my further view that Section 3(c) does not permit or require courts to impose preclearance upon the basis of the enactment of such run-off statutes, regardless of motive or effect. Certainly the congressmen and senators who voted for Section 3(c) would be shocked to learn that they had passed a statute purporting to place such power in our federal courts—the power to prohibit or punish majority rule. It is my further opinion that if Section 3(c) were so interpreted to permit or require preclearance on such a basis, then Section 3(c) itself would be unconstitutional. For even Congress may not penalize a state for its enactment of statutes requiring majority rule.

At some point in our national life I believe that the states will be *required* to operate their governments under majority

rule principles to give meaning and validity to the "one person-one vote" principle and to carry out the "Republican Form of Government" guarantee, and to make clear for once and for all that The People Rule. But I also do not believe it is necessary to reach that question in this case.

## B. Majority–Vote Statutes: If Not "Sacred Ground"

Assuming that the defendants had adequate notice of the non-pled preclearance issue with respect to these "other violations" and assuming that the plaintiffs are now permitted to amend their complaint after the trial to conform with the proof, and assuming further that such majority vote statutes are not "sacred ground" as discussed above, I must still dissent from the majority's conclusions that there is adequate proof in this record to establish constitutional violations justifying preclearance.

### 1. The Standard of Review

In *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the Supreme Court reaffirmed that plaintiffs who challenge an electoral structure on equal protection grounds must establish that the challenged structure was "conceived or operated as [a] purposeful device[ ] to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements in the voting population." *Id.,* 458 U.S. at 617, 102 S.Ct. at 3275 (citations omitted). While also rejecting a portion of the earlier plurality opinion in *City of Mobile v. Bolden, supra,* the *Rogers* court upheld a district court's use of the so called *Zimmer* factors as an appropriate means to determine whether a Georgia county's at-large system for electing its governing board of commissioners had been conceived or maintained for the purpose of discriminating against black voters. The primary *Zimmer* factors included a lack of minority access to the candidate selection process, unresponsiveness of elected officials to minority interests, the tenuousness of the state policy underlying the selection of a particular election scheme and the present effects of past discrimination that operates to minimize the effective participation of minorities in the political process. *Zimmer v. McKiethen, supra,* 485 F.2d at 1305. Other relevant factors, within the context of at-large or multimember election schemes, were: the geographic size of the district, the presence of anti-single shot voting provisions and majority vote requirements. *Id.*

The *Rogers* court concluded that use of the *Zimmer* factors appropriately applied, in the area of voting rights, the standard of proof of intentional discrimination developed in the equal protection cases of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Under this line of cases, a plaintiff challenging an electoral system need not show intent by direct evidence. Rather, "an invidious discriminatory purpose may often be inferred from the totality of relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." *Rogers,* at 618, 102 S.Ct. at 3276, *quoting, Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* 429 U.S. at 265, 97 S.Ct. at 563.

Proper inquiry into legislative intent requires that plaintiffs first show that a discriminatory purpose was one factor leading to the challenged action. Upon such a showing, the State may then come forward with evidence of neutral justification for the conduct including evidence that the same result would have occurred even absent any discriminatory motive. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See also Rybicki v. State Board of Elections of State of Illinois,* 574 F.Supp. 1082, (N.D.Ill.1982) (three-judge panel)[5]

**5.** Setting out the applicable standard of proof under plaintiffs' claim that a redistricting plan had been adopted in violation of the Fourteenth Amendment, the court in *Rybicki* wrote:

Applying *Mt. Healthy* analysis to the instant case involves the following analytic steps. First plaintiffs must establish a *prima facie* case of purposeful vote dilution under the

### 2. The Role of Majority–Vote Requirement Statutes

In the present case, I believe that the majority collapses portions of the appropriate analysis while inappropriately isolating others. Specifically, while *Rogers* and *Zimmer* recognize that certain electoral devices such as majority vote requirements are potentially relevant to the inquiry into legislative intent because these devices might, in conjunction with the challenged practice or practices such as at-large voting, enhance difficulties faced by minority voters in achieving electoral success, the majority here makes the analytic leap that all majority vote requirements are similarly suspect regardless of context. In other words, what had been introduced as evidence of a "discrimination-enhancing" device for the purpose of determining whether the 1981 apportionment had been adopted with invidious intent, has now been elevated to the level of being *the* electoral structure under attack. *See* dissent p. 606, *supra*, and Plaintiffs' Proposed Findings of Fact and Conclusions of Law at 43. Neither the *Zimmer* factors nor *Rogers* contemplate such a transformation.

Applying the *Zimmer* factors in the context of a claim under Section 2 of the Voting Rights Act, the Second Circuit has concluded that majority vote requirements are susceptible to challenge when used with at-large or multimember districting schemes, but not—as is the case in Arkansas—when used as a criteria for election to single-member offices. *Butts v. City of New York*, 779 F.2d 141 (2d Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986).[6]

In other words, majority vote requirements have been found to have potentially discriminatory effects within certain nar-

rowly-defined contexts not applicable here. It is my opinion that, properly analyzed, majority vote statutes never have a discriminatory effect. Some courts believe they do; but none in the circumstances of this case.

### 3. The Inability to Show Disparate Impact of Run–Off Statutes

#### a. Background

It is my opinion that run-off statutes have no racially discriminatory effect or disparate impact. So, even if the four statutes were passed with an intent to discriminate—which they were not—no constitutional violations could be found. As with conspiracy, we do not punish the simple *intent* to do wrong. As stated in *Whitfield:*

> As the Court understands the law in this area, if legislation was motivated or maintained out of a desire to discriminate against blacks ... *and* if, indeed, such legislation *in fact has that effect,* it would violate the Equal Protection Clause. (Emphasis supplied)

*Id.*, 686 F.Supp. 1365, 1367.

The majority acknowledges that "abolition of the requirement would likely have very little beneficial impact on minorities seeking office in majority white jurisdictions, while it could actually work against the election of blacks in many majority black jurisdictions." Majority op. at 593 n. 2, *quoting,* McDonald, *The Majority Vote Requirement: Its Use and Abuse in the South, supra.* But the majority then ignores this inability to show disparate impact, finding it to be "a question of policy or political effect which is irrelevant to our present inquiry into motivation." *Id.* It, therefore, appears to be the view of the

---

principles established in *White v. Regester,* [412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)] *Arlington Heights* and *Bolden.* Assuming that plaintiffs are able to make such a *prima facie* showing, the burden would then shift to the defendant Commissioners to establish that the redistricting in question would have occurred even absent the purpose to dilute minority voting strength.
*Id.,* 574 F.Supp. at 1107–08.

**6.** *See also* Note, *Geometry and Geography: Racial Gerrymandering and the Voting Rights Act,* 94 Yale L.J. 189, 197 (1984), *citing,* Parker, *The Results Test of Section 2 of the Voting Rights Act: Abandoning the Intent Standard,* 69 Va.L. Rev. 715, 763 (1983) ("[I]n a challenge to a discriminatory redistricting plan which employs single-member district, factors such as majority vote requirements ... would be irrelevant, since those are characteristics of multimember and at-large election schemes.")

majority that discriminatory motivation *alone* is sufficient to trigger equitable relief. Although there is some language in some of the cases that would support such a view, I do not believe that a majority of the Justices on the Supreme Court have accepted that idea. Nor should they. Section 3(c) is part of the Voting Rights Act. That act attacks standards, practices and procedures *that discriminate*. And preclearance is a remedy to protect against creation or enactment of standards, practices and procedures that have some discriminatory effect.

We are not here dealing with violations of the Fourteenth and Fifteenth Amendments independent of the statute. Preclearance is a statutory remedy. It requires that constitutionally challenged procedures, such as run-off statutes, be shown to have the purpose *and* the effect of violating the Voting Rights Act. And after preclearance is ordered those proposing new standards, practices or procedures must, before putting same into effect, demonstrate that they do not have the purpose *and* will not have the effect of violating the statute. But it is obvious that the majority believes that preclearance may be imposed even though the "violations" which serve as predicates for this remedy would themselves have no discernible discriminatory effect. The majority imposes the most drastic remedy available under the Voting Rights Act, while at the same time acknowledging that the statutes that trigger this judicial action do not even violate the less-stringent provisions of Section 2, which requires only a showing of discriminatory effect. How can the majority's decision further the purpose of the Voting Rights Act, or the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment, when that decision practically acknowledges that majority-vote requirements do not discriminate against black candidates or favor white candidates?

In sum, I believe an inquiry into whether the four run-off statutes have any discrimi-

natory effect is highly relevant to the present determination of legislative intent. Evidence revealing whether majority vote requirements "bear[ ] more heavily on one race than another" is precisely the type of factor the Supreme Court has said must be examined under equal protection analysis. *Rogers v. Lodge, supra,* 458 U.S. at 618, 102 S.Ct. at 3276. Logically, if it cannot reasonably be said that run-off elections have any disparate impact on black voters, then how can the enactment of such statutes, or the failure to enact such statutes, lead to an inference of discriminatory intent? I would conclude that a majority-vote statute which does not have such an effect likewise cannot be found to reduce minority political opportunity in violation of either the Fourteenth or Fifteenth Amendments.

The earliest of the challenged run-off statutes was passed in 1973 and the latest in 1989. If the Court, being suspicious, wished to know the actual effect of these four statutes, it could easily have suggested that *all* of the evidence reflecting the Arkansas experience with these statutes be brought before the Court.[7] After all, we know that two of the statutes were declared unconstitutional by the Arkansas Supreme Court so the evidence respecting their use would be minimal. And we know there would be little experience with the 1989 statute. So, surely it would not be difficult to provide the Court with *all* pertinent evidence concerning their use so the Court could carefully study that evidence to determine if any of the statutes actually had any discriminatory effects. But, no. So we have another evidentiary vacuum in a critical area. I can only conclude that the majority believes such evidence would be irrelevant and that such evidence—regardless of what it might show—would not change the majority's opinion.

b. *The Four Questioned Run–Off Statutes*

Of the four majority vote statutes relied upon as predicates for imposition of pre-

7. It must be remembered that it was the Court that caused what little evidence we have concerning these run-off statutes to be brought into the record in the first place. Having initiated

the inquiry, it should have insisted upon a full development of the issue after first alerting the parties—particularly the defendants—to the potential significance of the inquiry.

clearance, only two remain in effect. These are: Act 909 of 1983, now codified as Ark.Code Ann. § 7–5–106 and Act 905 of 1989, codified as Ark.Code Ann. §§ 14–42–206, 14–47–109(c), 14–48–109(a)(2)(B)(i). The two that are no longer in effect—Act 168 of 1973 and Act 269 of 1965 (later amended by Act 175 of 1977)—were invalidated by the Arkansas State Supreme Court on state constitutional grounds.[8]

As the majority notes, Ark.Code Ann. § 7–5–106 requires a run-off whenever a candidate for county or municipal office receives less than a majority of the votes in a general election. Ark.Code Ann. 14–42–206 creates a "municipal primary" for "all elections in cities and towns". Under the provisions of the latter statute, candidates may be qualified to run either by virtue of being nominees from their respective political parties, or as independent non-partisan candidates. The primary only occurs if more than two candidates qualify for the office. If only two candidates emerge, then no primary is held and the two simply proceed to the general election. § 14–42–206(c)(1)(B).[9]

It is true that the sum of these provisions is that candidates for most county and most municipal offices will now be subject to some majority vote requirement. The only exception appears to be in the election of directors in cities with the city manager form of government. Ark.Code Ann. §§ 14–47–109(c) and 7–5–106(b).[10] But the effect of such provisions is far from clear. For instance, the municipal primary statute allows cities to choose to have political parties conduct nominating primaries for candidates. Ark.Code Ann § 14–42–206(a)(3). This would then shift the point at which a candidate field is "narrowed" to an earlier point in time, and might subject candidates to the primary run-off provisions at issue in *Whitfield,* which the majority here finds does not violate the Constitution. Even if a black candidate were eliminated by the partisan run-off, he or she could still run for office in the municipal election as an independent, or that candidate could ignore the party primaries altogether, perhaps to conserve resources, and face only one or two opponents at the municipal primary stage. In any event, neither plaintiffs nor the majority explain how these majority-vote requirements impair the ability of any candidate, regardless of race, to participate equally in the political process.

Plaintiffs refer to the four run-off statutes by naming them after the four black candidates who were allegedly the targets of each enactment. Thus, we hear of the "Hollingsworth" Act, the "Handley" Act, the "Chitman" Act and the "Humphrey" Act. It must be pointed out that none of the candidates referred to were harmed by any of these statutes. Messrs. Hollings-

---

**8.** In *Whitfield* plaintiffs also contended that Act 909 of 1983 was enacted with discriminatory intent. This court found against the plaintiffs on that issue, stating:

> [A]lthough the legislature has recently endorsed the runoff principle for use in connection with certain *general* election contests, its motive, as discussed above, was not, overall, tainted by racial considerations. The fact that a handful of legislators in 1983 may have been motivated by such considerations is beside the point. We are to deal with the overall legislative intent.

It is disturbing that the majority here ignores those factual findings and conclusions made in Whitfield. Rather, it treats the challenge to Act 909 as an open issue to be re-litigated without any inhibition. What is to prevent yet a third challenge next year? True, we do not have identity of parties. But both cases were defended by the state's attorney general and some of the plaintiffs here were plaintiffs there. In any event, after hearing the evidence the second time, I am more convinced than ever of the correctness of my original decision on this issue.

**9.** In any event, the run-off provisions found in Ark.Code Ann § 7–5–106, insofar as they refer to municipal offices such as the one in which Leo Chitman was elected, see, infra, must be considered now to be of little consequence, if not repealed by inference by Ark.Code Ann. 14–42–206. In short, a municipality with a primary from which only two candidates will survive, will never be in the position of needing a run-off after the general election.

**10.** Contrary to the majority's assertion, *ante* p. 594, n. 4, Little Rock and any other cities having the city-manager form of government are not subject to any majority-vote requirement. Rather, officers are elected on the basis of the greatest number of votes. Ark.Code Ann. §§ 14–47–109(c) and 14–47–110(a)(4).

worth, Chitman and Humphrey were each elected by plurality votes of 35 percent or less according to the laws of the State of Arkansas in effect at the time. As for Pine Bluff mayoral candidate Robert Handley, whose campaign was preceded by enactment of Act 269 of 1975 (imposing majority vote requirements for municipal offices), again the evidence fails to show any discriminatory effect.

In the first election, Robert Handley received the second highest number of votes out of a field of five candidates. PX 30t. The largest vote-getter was Charles Moore, a white candidate who received 4,430 votes or 36 percent of the total cast, as compared to 3,455 votes, or 28 percent for Rev. Handley. PX 30v. In the absence of Act 269, Charles Moore would have been declared the winner. However, the run-off statute required that the two candidates face off against each other in a second election in which Mr. Moore received 68 percent of the vote compared to 32 percent for Rev. Handley. PX 30u. In short, neither the absence nor the presence of the run-off can be said to have had any effect on Mr. Handley's mayoral candidacy except, perhaps, that it gave him a second shot at election.

Contrary to the majority's position, these circumstances cannot simply be dismissed as irrelevant. *Rogers v. Lodge, supra,* makes clear that disproportionate impact is among the factors that must be considered in a claim that a voting standard practice or procedure violates the Fourteenth Amendment. In this case, plaintiffs failed to establish this factor.

### c. *The Inference of Racial Animus*

If the statutes at issue have no racially discriminatory effect, on what then does the majority base its inference that racial animus rather than some legitimate purpose motivated the legislature to pass these laws? The answer is that the majority finds it suspicious that three of these statutes were passed shortly after a black candidate won election by small pluralities, while in the case of Mr. Handley, the municipal run-off statute was enacted shortly before an election by plurality was likely to occur. Majority op. at 594–95.

Any discussion of the reasonable inferences to be drawn concerning legislative motive must begin with the recognition that the legislature is presumed to act constitutionally. *Borden's Farm Prods. Co. v. Baldwin,* 293 U.S. 194, 209, 55 S.Ct. 187, 191, 79 L.Ed. 281 (1934). Consistent with this principle, the Court has stated that judges should be "reluctant to attribute unconstitutional motives to the state, particularly where a plausible [constitutional] purpose may be discovered from the face of the statute." *Butts v. City of New York, supra,* 779 F.2d at 147, *quoting, Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 3066–67, 77 L.Ed.2d 721 (1983).

In *Whitfield,* I rejected the plaintiffs' use of Ark.Code Ann. § 7–5–106 as supporting evidence that the primary run-off had been enacted or maintained for a discriminatory purpose. *Id.,* at 1370. I also pointed out that run-offs in general elections were perhaps even more important than in party primaries:

> In the hierarchy of the fundamental values of a democratic state, the manner in which political parties choose to identify their nominees for public office positions is not as important as the procedures used to control the actual election of such public officers. Using this reasoning, courts might feel less restraint in interfering with the nominating primary process than with the general election process. It is true that, in Arkansas, political parties are not required to use open primaries to determine their nominees. They may use the convention process. So ruling that a primary runoff law was bad would not be as threatening to the basic democratic structure of government as would a like ruling with respect to a general election runoff law. (Indeed, under our republican form of government, the concept of plurality rule for general elections might itself be suspect constitutionally.) But the significance is immense in either situation. And in one-party states, the primary elections may be the critical ones in determining who shall ultimately be elected.

*Whitfield* at 1370, n. 1.

In the present case, the readily identifiable and legitimate purpose of these stat-

utes is simply to require election to municipal or county offices by a majority of voters and consequently prevent election by pluralities. While the benefits of such a policy may possibly be debated, it cannot be said that this purpose is facially improper or unconstitutional. Thus, the court should proceed with the level of reluctance and judicial deference that the Supreme Court has indicated is appropriate in such cases.

When the majority of judges of this Court concluded that the Board of Apportionment did not violate Section 2 of the Voting Rights Act when it drew the legislative district lines in 1981 for Pulaski County (even though the Board could have drawn four single member majority black VAP districts instead of one multi-member majority black VAP district with three members), its decision was influenced by the opinion of two incumbent black Pulaski County representatives. And it noted the testimony that "no black citizen of Pulaski County asked for single member districts." The majority concluded:

> It would be unfair to fault the Board of Apportionment for acceding to the expressed wishes of the only two black legislators from Pulaski County who appeared before it.

*Jeffers v. Clinton, supra,* 730 F.Supp. at 217. So why a different standard here?

The majority has found that the members of the Arkansas legislature acted with racially discriminatory intent in enacting these four run-off statutes. And yet, every black legislator voted *for* these statutes.[11] How can one fault the white members of the General Assembly who supported these run-off statutes when their black colleagues also unanimously supported them?

At the trial, plaintiffs made an effort to suggest that the black legislators who supported these run-offs just did not understand them. But it is clear to me that they did understand them and, indeed, like their white fellow legislators, believed them to represent good state policy. But if one takes the position that the black legislators did not understand the bills, on what evidentiary basis can one conclude that the white legislators understood that such legislation would have a racially discriminatory effect, or that such white legislators *intended* such bills to have that effect?

We start with what I contend to be beyond question: such legislative acts have no racially discriminatory effects. Then we find that all of the black legislators and practically all of the white legislators supported these acts. No one is accusing the black legislators of wanting to discriminate against blacks. And we know that over two-thirds of the white legislators in the Arkansas General Assembly have no, or negligible, black constituencies and no possible concern about blacks winning any election race in their districts by a plurality vote. And yet we also know that these same white legislators would be very concerned about possible plurality-wins. So there is simply no basis for finding that the black legislators and the overwhelming number of white legislators were motivated by any *racial* animus. What is left?

Some white legislators in districts with large black populations might have believed (wrongly, I submit) that such run-off statutes would protect them from being defeated by a black candidate. And they may have supported such legislation because of this erroneous, but discriminatory, belief.[12] So I ask: if a handful of white legislators have a racially discriminatory motive when they vote for such a statute, is that an adequate basis for finding and concluding that the *state* acted with such an intent? I say no. And remember, it is the state, as actor, that is implicated here.

---

11. It appears that in 1973 there were three black representatives and one black senator in the General Assembly. While there is still only one black senator, the number of black representatives went to four in 1982 and five in 1988.

12. A legislator who was motivated by a concern that some candidate might be defeated by a white or *black* person in a plurality-win situation would not thereby be evidencing a racially discriminatory motive. A simple belief in majoritarian democracy does not equate with any racial animus.

Perhaps the majority believes that if five percent of the members of a legislative body have some racial animus, that is enough to taint the overall legislative intent—perhaps upon some theory of "mixed motive." But that theory does not apply here. It is true that a racial motive need not be the only motive. If, "but for" the racial motive, the legislation would not have passed, then that is enough. But this means that a *majority* of both houses of the legislature must have such a racial motive and intent and it must also mean that in the absence of the racial motive, the legislation would not have passed. Neither proposition is true here: Clearly a great majority of the legislators had no such racially discriminatory intent; and, just as clearly, the legislation would have passed in the absence of any such intent. See *Rybicki, supra.* At the very least, there is no evidence to the contrary.

And while we are talking about the state, as actor, I further ask: do we consider the *total* state response, or just the legislative action, when we federal judges pass judgment upon the acts of the State of Arkansas? More particularly, if a state's legislature passes an act in violation of the United States Constitution and the state's supreme court then overturns that action, what are we to say about the state's action?

Here, two of the four challenged statutes were stricken down by the Arkansas Supreme Court on state grounds. See discussion *infra.* Therefore, should not those two run-off statutes be eliminated from consideration?

### d. *The Incomplete Record*

In evaluating the intent of these enactments, it is critical to appreciate the long historical preference this State has evidenced toward majority-vote requirements. Plaintiffs and the majority here chose to treat each of the statutes as if they were separate, isolated pieces of legislation— presumably to raise the inference that each enactment was specifically tailored by the General Assembly to prevent certain black candidates in certain areas from winning elections. A much fairer analysis, however, would take into account the history of

run-off, majority-vote enactments in Arkansas, the role various state court decisions had on requiring certain amendments thereof, and the consequent interrelatedness of the four majority-vote statutes now under attack.

Arkansas did not become involved with run-off statutes until the 1930s. In the 1928 primary election, the Democratic gubernatorial nominee won by a plurality of 42 percent of the vote. This caused concern. In 1936, Carl Bailey won with a plurality of 32 percent of the vote. Amendment 29 to our State Constitution and Ark. Code Ann. § 7–7–202 were the results. In an earlier attack upon these primary run-off laws, I concluded that the history leading to their passage (Amendment 29 by popular referendum) demonstrated that the run-off sponsors "were moved, primarily, by hostility to committee nominations in special elections and, secondarily, to hostility to plurality nominations. The latter, however, should not be minimized." *Whitfield v. Democratic Party of the State of Arkansas, supra, 686 F.Supp. at 1367–70.* Similarly, the majority here finds:

> The run-off primary has become a permanent fixture of party politics in this State. It reflects a deep-seated attachment to the principle of majority rule, one of the cardinal pillars of democracy. It was neither instituted nor maintained for racial reasons.

Majority op. at 593.

Rather than assuming that the State's justification for these statutes would be tenuous, the Court should begin with the recognition that, regardless of their uses elsewhere, majority-vote requirements in Arkansas have historically been associated with "good government" efforts and fundamental democratic principles rather than any desire to discriminate.

When one considers the historical legislative response in Arkansas to plurality election successes, that person will immediately note that the lower the plurality-win percentage, the more likely a political response in the form of a run-off statute. Is it not clear then that when plurality-win percentages fall below 30 percent, as we find in

this case, a legislative run-off response is quite predictable?

Amendment 29, and the subsequent unsuccessful effort to repeal it, make clear the attitude and philosophy of the people of this State toward plurality-win elections. That belief in majority rule, "one of the cardinal pillars of democracy" (majority op. at 593) is firmly ingrained in the Arkansas political psyche. Although the record has not been fully developed on the point, it is probably true that occasional or sporadic plurality-win votes in the 40 to 50 percent range may not trigger immediate response. Remember our experience with Amendment 29. See *supra*. As stated in *Whitfield* (1988):

> The evidence in this case and the literature on the subject reveal that the absence of runoff requirements in the law has not generally come to the citizen's or legislator's attention until some bizarre result occurs in an election. Most often it has occurred when some candidate getting 30 to 40 percent of the vote has ended up "nominated" or "elected." See, e.g., the discussion of Mr. Henry Alexander's article, "The Double Primary," supra. [fn. 2] Whenever a person is elected by a plurality vote in this country, there appears to be a tendency for the citizenry, and their legislative representatives, to become agitated and concerned. This is understandable because Americans have traditionally been schooled in the notion of majority rule. [fn. 3] The theory is: a majority vote gives validation and credibility and invites acceptance; a plurality vote tends to lead to lack of acceptance and instability.
>
> The concept of "majority-rule" dominates our national mind. But the problem is not confined to America. Many other democracies have had to deal with it. Recently, the French had a "run-off" election. The situation in South Korea appears to be that the present governing party did not get a majority of the votes in the most recent election. Their electoral rules are being challenged. Mr. Allende is said to have been the only Marxist who was ever elected the head of a democratic state. He received be-

tween 36 and 37 percent of the vote. A coup occurred. President Allende was murdered. Democracy has yet to return to Chile. Would a runoff requirement have preserved democracy there? One can only speculate. But the point is: there are compelling, obvious reasons, completely unrelated to race, for states to opt for runoff elections.

> **fn. 2** The Court views it as "sort of" like our attitude toward the Electoral College system. So long as the person elected usually or almost always has a majority of the popular vote, people do not get too agitated about that system.
>
> **fn. 3** The framers of our Constitution, while acknowledging this principle, also understood that a majority could run roughshod over a minority. The Bill of Rights was their answer to the prospect of the tyranny of the majority.

*Id.*, 686 F.Supp. at 1373. Since *Whitfield*, Chile has instituted run-offs and just recently we witnessed run-offs in Peru and Hungary. Surely there are cogent reasons for run-off laws unrelated to race.

###### e. *The Interrelationships Among the Four Statutes*

Both the plaintiffs and the majority treat each of the four run-off statutes as separate from each other. This treatment serves a dual function: first, it divorces the recent run-off statutes from the context of the long-standing historical preference shown in this State for majority-rule requirements; second, it makes it easier to link passage of each statute with the election of a candidate who was black, ignoring that these persons also won office with support from fewer than a third or fewer of the voters. In short, this mind-set (i.e., it was the race of a candidate rather than the bizarre election results that motivated each enactment), ignores the complex of political and historical forces, as well as judicial decisions, that when considered as a whole make the inference of racial discrimination glaringly simplistic, perhaps even paranoid. In truth, the recent statutes form a "package" of legislation aimed

at implementing the goal of majority rule in a manner that disregards race.

### (1) *Act 168 of 1973*

Members of the Little Rock Board of Directors are elected on an at-large basis, at non-partisan elections in which ballots show no party designation for candidates. Ark.Code Ann., § 14–47–109(d), as amended, (1989). This method of electing certain municipal officers was adopted in 1956 as part of a reform movement aimed at un-doing the widespread scandal and corruption that had previously existed in the city's aldermanic form of government. *Leadership Roundtable v. City of Little Rock*, 499 F.Supp. 579, 585–86 (E.D.Ark.1980), *aff'd*, 661 F.2d 701 (8th Cir.1981).

As stated earlier, Mr. Hollingsworth was elected to the Little Rock Board of Directors in November 1972 with a plurality amounting to about 35 percent of the total votes cast. *Id.* Within months, the Arkansas General Assembly passed Act 168 of 1973 providing that members of Board of Directors be voted on at a "preferential primary" to be held two weeks before the general election. A candidate at that first election receiving a majority of the vote would be certified for that position on the Board. Otherwise, the two largest vote-getters would face off against each other at the general election. *See* Ark.Code Ann. 14–47–109(c) (1987).

Before Act 168 could ever be used it was invalidated by the Arkansas Supreme Court. *Mears v. City of Little Rock*, 256 Ark. 359, 508 S.W.2d 750 (1974). Relying on state constitutional grounds, the Court held that Act 168 would have disenfranchised numerous voters, particularly those without party affiliation, because the "preferential primary" coincided with the day party primaries are held. *Id.*, 256 Ark. at 363–62, 508 S.W.2d 750. Since directors were to be non-partisan positions, the likely confusion to voters required invalidation of the Act. *Id.*

It is the coincidence of Mr. Hollingsworth's election and passage of Act 168 that leads the majority to conclude that this statute was motivated by his election. But why the majority concludes that it was Mr. Hollingsworth's race, rather than his small plurality victory, that motivated the legislature is never explained. And for reasons already discussed above, the State has been deprived in this case of the opportunity to even offer a neutral justification for this enactment. *Cf. Rybicki v. State Board of Elections, supra.* Allowed to move beyond the incomplete and distorted record, however, we get a very different picture than the one drawn by the majority.

At the time the General Assembly passed Act 168, black legislators had been elected to both houses of the General Assembly. It is reasonable to conclude that they would have voiced opposition to Act 168 if they believed the statute was racially-motivated. Yet Act 168 passed both houses unanimously. The votes were 26–0 in the Senate, and 69–0 in the House. Journals of Arkansas House of Representatives and Senate (1973). This result suggests then that neutral justifications for Act 168 outweighed concerns, even among black legislators, about the effect this law might have on black candidates and voters and undermines the inference of racial animus. Second, it must be remembered that some legislative response following the election of a candidate by a 35 percent plurality is consistent in a state that amended its constitution to provide for run-offs shortly after the nomination of a gubernatorial candidate by only 32 percent of the vote. *See Whitfield, supra.* Nor were majority requirements in municipal elections new. In Little Rock, prior to adoption of the city-manager government, city aldermen were elected at both the general and primary elections by majority vote. *Leadership Roundtable v. City of Little Rock, supra*, 499 F.Supp. at 585.

Third, if it was race that motivated the legislature to pass a Act 168, then why did the State not so react back in 1968 when a black candidate, Mr. Bussey, was elected to the Little Rock Board of Directors? *Id.*, at 588. One likely explanation is that Mr. Bussey's 41 percent plurality election did not raise the same alarm as the much smaller, but nonetheless victorious, vote received by Mr. Hollingsworth. The differ-

ent outcomes following the elections of blacks by plurality votes to municipal government supports the inference that election by pluralities below a certain point, rather than race, motivated passage of Act 168.

Finally, the effect of the *Mears* decision must also be taken into account both with respect to Act 168 and the General Assembly's most recent majority-vote provision found in Act 905 of 1989. *Mears* did not prevent the legislature from re-enacting a majority-vote requirement so long as it was consistent with the non-partisan scheme of Board of Directors elections. A General Assembly bent on preventing blacks from winning municipal elections could have re-enacted a majority-vote statute before the 1976 election in Little Rock, when Mr. Hollingsworth or other black candidates would again attempt to gain municipal office. However, no such effort was made. Nor did the legislature act in 1978 when Mr. Bussey was again elected to the city's Board of Directors. *Leadership Roundtable*, at 589. As in his earlier victory, Mr. Bussey won election that year by a plurality, but a substantial one of 46 percent. *Id.*

And so, since adopting the city manager form of government Little Rock directors have been elected solely on the basis of receiving the greatest number of votes. The effort in 1973 to require majority elections came to naught after *Mears*. And despite the election of black candidates to the Little Rock Board of Directors since, no majority vote requirements have been reenacted. Moreover, election by plurality in this city was recently codified through enactment of § 6 of Act 905 of 1989, Ark. Code Ann. § 14–47–109(c) (1989), other portions of which the majority concludes are discriminatory. It is instructive to jump forward then to this statute.

### (2) *Act 905 of 1989*

As discussed earlier, Act 905 of 1989, Ark.Code Ann. § 14–42–206 (1989) creates municipal primary elections for all cities

and towns in the State. Section 6 of the Act, Ark.Code Ann. § 14–47–109(c) excludes board of directors elections in municipalities with the city-manager form of government. This exemption was proposed by Representative Brown, who during the trial of this case testified that she looked upon Act 905 with a "jaundiced" eye because it was proposed shortly after the election of Marion Humphrey. However, Rep. Brown's position on this point must be seriously questioned, because despite her allegation at trial of discriminatory intent, she supported the passage of Act 905. In fact, the majority-vote statute passed the House unanimously with a vote of 97–0. Arkansas Legislative Reports, 77th General Assembly, Regular Sess. (1989) (hereinafter "Legislative Reports"). It is also significant that there were four other black legislators in the House when Act 905 was being considered. Yet they too voiced no opposition at the critical moment of enactment.[13]

Nor does Rep. Brown's sponsorship of a provision allowing plurality elections in municipalities with the city-manager form of government amount to an objection to the general principle of majority-vote requirements. First of all, Section 6 does no more than codify the effect of the Arkansas Supreme Court's decision in *Mears*. More important to the analysis of legislative intent, Section 6 of Act 905, or what could be termed the "Brown" Amendment to the "Humphrey" Act, would not have helped Judge Humphrey, who was purportedly the target of the Act. Nor would the "Brown" Amendment help black candidates in municipalities with the mayor/city council form of government. Section 6 carves out an exception that effectively applies to very few cities in Arkansas. Meanwhile, the remaining provisions of Act 905—which Rep. Brown and apparently every other black legislator in the House supported— imposes majority-vote requirements in

---

**13.** In the Senate, Act 905 passed with a vote of 23–6. Legislative Reports. There was at this time at least one black state senator, and whether he was among those voting in opposition to the statute is unknown. At the very least, it is a

piece of the legislative history that defendants would have likely developed had they been given notice that majority-vote statutes were to be an issue at trial.

most of the municipalities in the State. This includes those areas where blacks constitute a substantial portion of the population, and where the majority has indicated it might enjoin the use of Act 905 in the future. I would find that neither Rep. Brown nor any other legislator saw any danger posed by this statute to black voters or black candidates. It is simply disingenuous to conclude that a state law was enacted with discriminatory intent when no such objection was raised during the legislature's deliberations, and when at least some of those who now make the accusation nonetheless supported its passage.

### (3) Act 269 of 1975

This Act required run-off elections for mayors of cities of the first class. The majority opinion states that it was passed in anticipation of the candidacy of Mr. Robert Handley, a black, for the office of mayor of Pine Bluff. Again the majority ignores much of the relevant history that is available and chooses to conclude that it is self-evident that Rev. Handley's candidacy motivated passage of Act 269. Again the majority is wrong.

As in the passage of Act 168 two years earlier, Act 269 received unanimous support in both the House and Senate.[14] Once again this raises the inference that legitimate, non-discriminatory justifications outweighed opposition to the majority-vote requirement—even apparently from those black legislators who were then present in the General Assembly.

It is clear that Pine Bluff State legislators took a special interest in the passage of Act 269. Although originally proposed by a North Little Rock state senator, Pine Bluff representatives were chiefly responsible for steering the legislation through the General Assembly. PX 30fff. However, the proposition that Act 269 was motivated by the presence of a black candidate in the race for mayor, rather than the desire to avoid an election by plurality, cannot withstand scrutiny.

It is greatly significant that this conspiracy theory has been raised for the first time in this litigation—some fifteen years after the fact. Although the record contains numerous exhibits consisting of newspaper accounts of the 1975 Pine Bluff mayoral race, and the passage of Act 269, no contemporaneous objection to the run-off provision was raised by any candidate. Nowhere do we find Rev. Handley, or any other political leader, expressing the opinion at the time of the election that race played a role in the passage of Act 269. In fact, as he prepared for the run-off against Charles Moore, Rev. Handley expressed the belief that race would not likely play a significant role in determining who the next mayor of Pine Bluff would be. PX 30m.

Pine Bluff's only black state representative, Henry Wilkins III, did attempt to insert an amendment that would have delayed the effective date of Act 269 until after the mayoral election. PX 30fff and PX 24 at 352. His reasons for wanting such a delay are unknown. However, as the final House vote indicates, Rep. Wilkins did not manifest any opposition to the majority-vote requirement in general since he ultimately did not oppose passage of the Act. Had he believed at the time that Act 269 was racially motivated, it seems reasonable to assume that Rep. Wilkins, as well as other black legislators, would have voiced opposition to the statute by voting against it.

The political climate of the city at the time of the passage of Act 269 must also be considered. Again this evidence does not support the inference that race motivated passage of the majority-vote requirement. In *Dove v. Moore*, 539 F.2d 1152 (8th Cir.1976), the court of appeals affirmed a district court's determination that the City of Pine Bluff's at-large system of electing city council members was neither created nor maintained for the purposes of discriminating against black citizens. In assessing the evidence, the court found sig-

---

**14.** Act 168 of 1973 was passed in the Senate with a vote of 26–0; in the House, the vote was 69–0. Legislative Reports at S–N–5.

nificant several factors that are equally relevant to the present case:

(1) "that the black residents of Pine Bluff have full, open, and equal access to the city's political processes;"

(2) "that they play an active and significant political role in city politics;"

(3) that although "the at-large system is not designed to maximize the number of minority candidates elected, it serves other values ... [including the creation of a system in which] every candidate has a 40 percent black constituency which cannot be ignored with impunity."

(4) "that blacks and whites alike have rejected race as the overriding criterion in voting for candidates in Pine Bluff city elections."

*Id.*, at 1155–56.

To illustrate the latter factual finding, the court of appeals specifically referred to the 1975 mayoral election involving Rev. Handley.

Mayor [Austin] Franks' resignation in April of 1975 necessitated a special election. Four white candidates and one black candidate sought to succeed Mr. Franks as mayor. All of the white candidates campaigned actively in black areas. One of the white candidates received substantial black support, including active participation of local black leaders in his campaign. In a group of precincts identified as being from 90 percent to 100 percent black, the white candidates received 25 percent of the vote, and in one such precinct their support was as high as 44 percent. Yet, despite this "diversion" of black votes, the black candidate, Rev. Robert Handley, received the second highest number of votes cast and thus was in a runoff election, which he lost.

*Id.*, at 1154.

When fully analyzed, the picture that emerges does not support the type of conspiratorial motives that the plaintiffs and the majority now attach to the proponents of Act 269. Plaintiffs cite a newspaper article that mentions that the legislators realized "the effect [the run-off provision] would have on the special election." PX

30fff. But this does not prove racial animus. It would be ludicrous to assume that politicians would fail to appreciate the importance of having a run-off apply to a city where the number of candidates in an upcoming election made it highly likely that no person would receive a majority of the vote. However, that the race of one of the five candidates also played a motivating role in the legislation as a whole is simply unsupported given the totality of relevant circumstances surrounding the election.

Finally, it should be noted that when the General Assembly was considering Act 269, an amendment that would have limited its application to only Pine Bluff and North Little Rock was proposed and rejected by the legislature. PX 30fff. Had the General Assembly been aiming only at the anticipated race of Rev. Handley, such a limitation would be some evidence of such a focus. The rejection of this amendment and application of Act 269 to *all* cities of the first class is strong evidence that—regardless of the discriminatory intent of some few legislators—legitimate, non-discriminatory motives predominated in the passage of the Act. *See Mt. Healthy, supra.*

### (4) *Act 909 of 1983*

To the extent the majority can be said to have felt any reluctance to impute illicit motives to the General Assembly and the Governor, such restraint has been outweighed by what they see as the self-evident duplicitous justification for majority vote requirements. Again note Judge Arnold's language:

Devotion to majority rule for local offices lay dormant as long as the plurality system produced white office-holders. But whenever black candidates used this system successfully.... []aws were passed in an attempt to close off this avenue of black political activity.

Majority op. at 594–95.

There is, as I point out above, no comparative data in the record to support the majority's assumption that white candidates had been repeatedly elected by similar pluralities without legislative response. What a full trial would have revealed about

plurality elections in Arkansas we can only speculate. Yet this only further vindicates the wisdom of our due process requirements of notice and an opportunity to be heard. It is astounding when one compares the record in this case with that in *Butts v. City of New York, supra,* where the legislative motive for the enactment of a challenged run-off statute was truly litigated.

The closest we come to evidence of disparate treatment is plaintiffs' recitation of the facts leading to the passage of Act 909 of 1983, Ark.Code Ann. § 7–5–106 requiring a run-off unless a candidate receives a majority of the vote in the general election for county and municipal offices. Upon closer examination, however, it is clear plaintiffs either misunderstood or misstated the relevant facts leading to the passage of this Act.

According to plaintiffs, Act 909 was passed by the General Assembly in quick response to the 1982 plurality election of Leo Chitman, a black man, as mayor of West Memphis. Again, according to the plaintiffs, the first runner-up and white incumbent, Mayor Joyce Fergeson, had herself been elected in 1980 by a plurality. Thus, plaintiffs argue:

> The fact that Fergeson had been elected by a plurality without prompting enactment of a runoff requirement demonstrates that it was the fact that Chitman is black, rather than his percentage of the vote, that spurred the legislature into action.

Plaintiff's Post-trial Brief at 93.

Plaintiffs misstate the facts.

Before discussing the passage of the so-called "Chitman" Act, it is necessary to review briefly the state of majority-vote requirements for most municipalities immediately prior to its passage. As already discussed, long before the Chitman–Fergeson race, Act 269 of 1975 provided that all first-class cities with mayor/council forms of government, including the City of West Memphis, were required to hold run-offs

within two weeks of the election if no candidate for municipal office received a majority of the vote. *Fergeson v. Brick,* 279 Ark. 288, 289–90, 652 S.W.2d 1 (1983).

In 1977, the General Assembly passed Act 175 declaring that run-offs would henceforth apply only to those cities with populations between 57,000 and 61,000. *Id.* This effectively limited application of the run-off law to North Little Rock and Pine Bluff. *Id.* It was the same amendment that the legislature considered and rejected two years earlier when Act 269 was originally adopted. Again, the incomplete record leaves us with no information that would allow us to determine why the legislature changed its mind in 1977 and passed the limiting amendment. It is known, however, that the amendment received near unanimous support passing the House by a vote 79–2, and the Senate by 30–1. Legislative Reports, *supra.*

This amendment is significant here for the purpose of evaluating Act 909. In truth, had Act 175 of 1977 not been passed, Mr. Chitman would have been forced into a run-off in his mayoral race for West Memphis. As it was, he won by a plurality. The effect of Act 909 of 1983, as far as Mr. Chitman is concerned, is that it returned the law to the status that it was in immediately after the enactment of Act 269 of 1975. So the idea that the law requiring run-offs for mayors of cities of the first class was first passed in response to Mr. Chitman's election in 1982 is simply not true. That same legislative intent had been expressed in the 1975 Act long before his candidacy.

In the 1982 election for mayor of West Memphis, Leo Chitman narrowly defeated Joyce Fergeson by a margin of 0.8 percent of the vote. Neither gained a majority. Mr. Chitman received a 27.9 percent plurality while Mrs. Fergeson received 27.1 percent.[15] Since the run-off provisions of Act 269 no longer applied to West Memphis, Mr. Chitman was certified the winner.

---

**15.** A total of 7,636 ballots were cast for the field of six candidates. Chitman received 2,130 votes and Fergeson 2,069. This difference, 61 votes, represents less than one percent of the total votes cast (0.8%).

Following her defeat, Mrs. Fergeson then challenged the constitutionality of Act 175 of 1977. Specifically, she sought the invalidation of the run-off amendment on the ground that its limitation to first-class cities within a narrow and seemingly arbitrary population range violated the State constitution. *Fergeson v. Brick, supra,* 279 Ark. at 290, 652 S.W.2d 1.

The Arkansas Supreme Court agreed but declined to grant Fergeson the relief sought, namely, invalidation of Mr. Chitman's election as mayor. The court explained that Mrs. Fergeson had consciously chosen to forego an earlier challenge to Act 175 although she was aware that the new amendment would mean that the 1982 election in West Memphis could thus be decided by a plurality. Noting Fergeson's initial disinterest with this change in the law, the Arkansas Supreme Court explained "[s]ince she received about 70 percent of the vote in the [1980] election, she did not complain about [Act 175]." *Id.,* at 291, 652 S.W.2d 1. So plaintiffs' statement that Fergeson had herself been elected by a plurality in 1980 is false.

Following the *Fergeson* decision, the General Assembly passed Act 909 requiring run-offs in all municipal and county elections. Only municipalities with the city-manager form of government, such as Little Rock, were excluded. The effect was to remove the limitation that the Arkansas Supreme Court had found arbitrary in *Fergeson.* However, contrary to plaintiffs' assertions there is no demonstration that the legislature was spurred to action simply because a black candidate had been elected mayor. Rather, the legislature acted reasonably to correct a defect in recently invalidated statute as well as to avoid bizarre election results in the future.

### f. *The Remedies Imposed*

Having ruled that the enactments of the four run-off statutes violated the Constitution, the majority opinion then turns to the consequence in terms of remedy. The most interesting statement in this regard is found in footnote 7 to its opinion:

This does not mean that our decree in this case will enjoin the enforcement of the existing run-off statutes for county and municipal offices. For one thing, the evidence of illicit motivation applies only to municipal elections in portions of the State with substantial minority populations. And for another, plaintiffs at the oral argument at the close of the trial in this case disclaimed any desire for such relief. They bring up the series of municipal run-off statutes only as constitutional violations justifying preclearance under Section 3(c). Whether and to what extent these statutes may continue to be validly applied must be left to a case-by-case determination in the future. At least this much, though, can be said: If a black candidate leads in the first election and then is defeated in a run-off required by either Ark.Code Ann. § 7–5–106 or § 14–42–206, the election will be vulnerable to a strong constitutional challenge.

So while the majority concludes that these run-off statutes were enacted in violation of the Constitution, and further concludes that such violations constitute the basis for the Court's preclearance order, still it does not strike them down or hold them invalid! Having served their purpose, they are left "twisting in the wind," so to speak, to the great confusion of the citizens of this State.

Why this strange result; why not enjoin the enforcement of these statutes if they were unconstitutionally enacted? Because, we are told, "For one thing, the evidence of illicit motivation applies only to municipal elections in portions of the State with substantial minority populations." Majority op. at 595, n. 7. Is the Court saying that if it enjoined the enforcement of such statutes, that could only be done in certain counties or areas with "substantial minority populations" but not in areas with "insubstantial" minority populations? And note that the majority does not explain what it means by "substantial." So many officials of the State, and possible candidates, are left to speculate how the federal courts will deal with the use of the run-off statutes in their areas. Obviously a very unhealthy situation.

Another reason for the majority's decision not to enjoin the enforcement of the existing run-off statutes is: "Plaintiffs ... disclaimed any desire for such relief." Majority op. at 595, n. 7. I have already expressed reservations about courts' leaving the choice of remedies up to the "desire" of the parties, see *Jeffers v. Clinton,* *supra,* 730 F.Supp. at 262–63, but I also question why the plaintiffs do not seek to enjoin the enforcement of those run-off statutes. Could it be that they *know* such statutes have no discriminatory effect and that they can only be useful in the *Whitfield* context as a trap for the unwary? In other words, when the law is clear one way or the other that either plurality-win or majority-win rules apply, there is no racially discriminatory effect. But if a run-off statute is left in effect but placed under a judicial cloud, then opportunity is sensed—albeit not fair and equal opportunity. The majority holds that the validity of the run-off statutes "must be left to a case-by-case determination in the future." Then it states:

> If a black candidate leads in the first election and then is defeated in a run-off ... the election will be vulnerable to a strong constitutional challenge.

*Id.*

The majority further states:

> Plaintiffs have not requested equitable relief with respect to these particular majority-vote statutes, except for preclearance itself, but equitable relief in the nature of an injunction or a declaratory judgment would clearly be justified, especially to prevent the statutes from being used in the future to deprive a black candidate receiving a plurality of the office for which he or she is running.

Majority op. at 600.

Let us call this the "Jeffers invitation." Frankly, I believe this solution to be unseemly. It says to black candidates, let your opposition believe that the run-off laws are in effect and will be followed. Then if you lead in the preferential primary, you will have it made whether or not you win in the run-off. Why? Because the federal court has invited you to ask it to declare you the winner. And it is telling you that you have a "strong constitutional challenge" and that you do not have to conform to the same rules as your white opponents. Shame! The judicial enthronement of unprincipled chance and racial preference!

And if we are going to give racial preferences in this unprincipled game of judicial roulette, what standards shall we use for racial qualification? If the father of the candidate leading after the first election is black and the mother white, is that sufficient? If one grandparent is black and the rest of the ancestors white, is that enough? Just who are the potential beneficiaries of this race-conscious ruling?

## IV. CONCLUSION

In my earlier dissent, I made the point that while race conscious preferences might withstand constitutional muster in other areas, certainly they cannot in the political arena. And I attempted to point out the dangers inherent in the majority's contrary position—particularly its appeal to separateness and parochialism. Others have noted different causes for this retreat from our "melting pot" tradition. For instance, Professor Arthur Schlesinger, commenting on "Ethnic Studies" in the April 23, 1990 *Wall Street Journal,* states:

> The melting pot was one of those metaphors that turned out only to be partly true, and recent years have seen an astonishing repudiation of the whole conception. Many Americans today righteously reject the historic goal of "a new race of man." The contemporary ideal is not assimilation but ethnicity. The escape from origins has given way to the search for "roots." "Ancient prejudices and manners"—the old-time religion, the old-time diet—have made a surprising comeback.

> These developments portend a new turn in American life. Instead of a transformative nation with a new and distinctive identity, America increasingly sees itself as preservative of old identities. We used to say e pluribus unum. Now we

glorify pluribus and belittle unum. The melting pot yields to the Tower of Babel.

\*    \*    \*    \*    \*    \*

We should take pride in our distinctive inheritance as other nations take pride in their distinctive inheritances.

\*    \*    \*    \*    \*    \*

If we repudiate the quite marvelous inheritance that history has bestowed on us, we invite the fragmentation of our own culture into a quarrelsome spatter of enclaves, ghettos and tribes. The bonds of cohesion in our society are sufficiently fragile, or so it seems to me, that it makes no sense to strain them by encouraging and exalting cultural and linguistic apartheid. The rejection of the melting pot points the republic in the direction of incoherence and chaos.

Once race based political preferences are accepted, they will quickly gain the status of a "group right" from which it will be most difficult to retreat. Once we slide down that slippery slope, it will be almost impossible to regain the high ground of constitutional purity reflected in the concept of total equality.

What is required, what all must insist upon, is fair and equal opportunity for all to participate in the political process—nothing more, nothing less. This is what the Voting Rights Act and our Constitution require. This principle energizes the American spirit at its best. It is because the great majority of our citizens believe in fairness and in the imperative of equal opportunity that we have made progress in the never-ending battle against discrimination. When the law stands for fairness and equal opportunity, it is respected and followed—often enthusiastically, sometimes grudgingly, but followed. But let the law stand for special privilege and racial or language preferences, or for minority rule, and a new dynamic of resentment takes over, fueling the arguments of erstwhile discredited bigots and enervating and confusing the fair and decent among us. At the very moment in our history when the sun is rising and a new day dawning, the law should not force us backward. And, despite any impatience federal courts may have with majoritarian democratic decisions, those courts would do well to remember that the whole American enterprise is bottomed on the principle that *The People Rule.* We sacrifice that principle at our great peril!

I believe the majority's views as previously expressed in its opinions on Section 2 of the Voting Rights Act and in its opinion filed today on the constitutional issues are wrong—bad wrong. Therefore, on the latter issues, I must dissent from the majority's conclusion that plaintiffs have established any constitutional violations justifying equitable relief within the State of Arkansas with respect to voting rights. There being no other predicate for imposition of preclearance, I must also dissent from the majority's grant of relief under Section 3(c) of the Act.

## JUDGMENT

In accordance with the opinion filed today, it is CONSIDERED, ORDERED, ADJUDGED, and DECREED as follows:

1. The final order with respect to the claim under Section 2 of the Voting Rights Act, filed on March 5, 1990, is incorporated herein by reference.

2. The plaintiffs' request for preclearance under Section 3(c) of the Voting Rights Act is granted in part, and no voting qualification, prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect at the time this decree is entered shall be enforced unless and until this Court finds that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the voting guarantees set forth in § 1973b(f)(2) of Title 42 of the United States Code; provided, that such qualification, prerequisite, standard, practice, or procedure may be enforced if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of this State to the Attorney Gener-

al, and the Attorney General has not interposed an objection within 60 days after such submission; provided further, that the provisions and restrictions contained in this paragraph 2 shall be limited to voting qualifications, prerequisites to voting, standards, practices, and procedures imposing or relating to a majority-vote requirement in general elections.

3. Paragraph 2 of this judgment shall remain in full force and effect until further order of this Court.

4. No plan of apportionment adopted by the defendant Board of Apportionment for the Arkansas General Assembly after the 1990 census may go into effect until 60 days have elapsed from the date of its final adoption by the Board. This Court retains jurisdiction, within that time period, for the purpose of entertaining any challenge by the plaintiffs in this case to such plan. If no such challenge is forthcoming, the plan may go into effect, subject, however, to the right of any aggrieved citizen to challenge it in an appropriate action at a later time.

5. In all other respects the request of plaintiffs for preclearance is denied.

6. This Court retains jurisdiction for the purpose of entering such other orders, if any, as may be necessary to effectuate this judgment.

It is so ordered.